131 So.2d 369 (1961)
CENTRAL LOUISIANA ELECTRIC CO., Inc.
v.
COVINGTON & ST. TAMMANY LAND & IMPROVEMENT CO.
No. 5220.
Court of Appeal of Louisiana, First Circuit.
May 22, 1961.
Rehearing Denied June 30, 1961.
*370 Jack J. Cousin, New Iberia, J. Monroe Simmons, Covington, Chaffe, McCall, Phillips, Burke & Hopkins, New Orleans, for appellant.
Dalton J. Barranger, Covington, for appellee.
Before ELLIS, LOTTINGER, JONES, HERGET and LANDRY, JJ.
*371 LANDRY, Judge.
This expropriation suit, instituted by plaintiff, Central Louisiana Electric Co., Inc., against defendant, Covington & St. Tammany Land & Improvement Co., to acquire a servitude or right of way for construction of an electrical transmission line, is one of eight such actions brought by plaintiff against various defendant property owners to secure the required easement to erect the mentioned facilities in St. Tammany and Washington Parishes, Louisiana. Named as defendants in the following numbered cases, all consolidated herewith for purposes of trial and appeal, are Stiegler et al., Number 5221, 131 So.2d 387; Stiegler, Number 5222, 131 So.2d 390; Burns et al., Number 5223, 131 So.2d 390; Barranger, Number 5224, 131 So.2d 393; Baldwin, Number 5225, 131 So.2d 396; Harang, Number 5226, 131 So.2d 398; and Rice et al., Number 5227, 131 So.2d 405.
The line proposed to be constructed by plaintiff will extend from a point approximately 2 miles north of Madisonville, St. Tammany Parish to a terminal approximately 2½ miles northwest of Sun, Washington Parish, Louisiana, and is intended to supply necessary additional power and line capacity to meet increasing demands for electricity in the Washington-St. Tammany area. The easement is required for erection of a 5-wire, 230,000-volt electric transmission line consisting of three 3/8ths inch steel glazed wires over two one-inch aluminum wires with steel-reinforced cores, supported by steel towers varying from 60 to 90 feet in height and having basal dimensions ranging from 21 to 25 feet square. The towers will be spread at intervals varying between 1,100 and 1,300 feet and the wires will have minimum ground clearance of 35 feet. The wires will be suspended in the center of the right-of-way so as to be well clear of houses, trees and other obstructions. The servitude required is to have a width of 125 feet. Plaintiff does not seek to expropriate the lands in fee but merely to acquire an easement for the purpose stated.
The district court rendered judgment in favor of plaintiff granting the several servitudes sought by plaintiff upon payment to defendants of certain sums specified as compensation in each particular instance. Plaintiff has appealed from the various judgments in each case complaining of the awards allotted the respective owners as severance damages and, in addition, in suits Number 5226 and 5227 further complaining the amounts granted defendants therein, Jack F. Harang and Atwood L. Rice, et al., respectively, for the servitudes taken, were excessive and should be reduced.
In answering plaintiff's appeal, defendants do not seriously question either the necessity for the taking, that is the need of plaintiff to construct the line to meet the growing demand for additional electrical power in the area to be served by the proposed line, or the amount and extent of right-of-way plaintiff seeks to acquire for the proposed facilities. In all instances excepting the Jack F. Harang suit, Number 5226, defendants request an increase in either the compensation awarded for the servitudes taken or severance damages to remaining property.
On this appeal each defendant urges plaintiff's suit should have been dismissed by the trial court for plaintiff's alleged failure to negotiate prior to institution of each suit and also for alleged non-joinder of an indispensable party plaintiff. Alternatively, defendants maintained in the court below, and reurge on appeal that the judgment of the trial court should be amended to declare the several servitudes nonassignable or require that the line be constructed underground or that, if constructed above ground, the line be located on their respective boundaries but not along any highway frontage.
Two of the several issues pleaded in defense of these suits, namely, nonassignability of the servitude to be acquired and *372 non-joinder of an indispensable party have been expressly abandoned by defendants. There remains for decision (aside from the question of compensation) the plea of maturity and the following contentions advanced by defendants: (1) Plaintiff should be required to take the property in fee instead of merely a servitude or easement; (2) Plaintiff's arbitrary selection of the route for the line constitutes an abuse of its discretion in this regard considering other suitable routes are shown to be available; (3) Under the authority which plaintiff seeks to expropriate defendants' properties, plaintiff is prohibited from constructing such a dangerous facility; (4) Alternatively, plaintiff should be required to construct the line underground to eliminate danger therefrom and accommodate the convenience of the landowner as required by the provisions of the statute under which the taking is authorized and (5) In the further alternative, plaintiff should be required to construct the line along defendants' respective property lines to suit defendants' convenience.
Defendants first submit that contrary to the jurisprudence of this state, no good-faith attempt was made by plaintiff to negotiate with any of the landowners herein involved before instituting these actions. It is true, as defendants contend, the Supreme Court of this state has held that where such issue is raised by exception of prematurity filed in limine litis, the suit may be dismissed as of non-suit upon a showing of lack of bona fide negotiation with the landowner by the expropriating authority. Calcasieu & Southern Ry. Co. v. Witte, 224 La. 1091, 71 So.2d 854. Where no such exception is timely filed, however, the only penalty imposed for failure to so negotiate consists in the expropriating agency being cast for costs. City of Shreveport v. Noel, 114 La. 187, 38 So. 137. In the case at bar the issue is rendered moot considering the record in each case contains a stipulation wherein plaintiff assumes all liability for costs.
The contention plaintiff should be required to take the land in fee is patently without merit. Precedent has established the rule that in an expropriating proceeding the expropriating authority may take only such property, both in nature and extent, or rights therein, as is reasonably necessary in the exercise of the purpose or function for which the taking is authorized. Prior jurisprudence has also firmly established the rule that an expropriating authority will be neither permitted nor required to take more land, or rights therein, than is reasonably sufficient and suitable for its particular need. The records herein show that virtually all properties are situated in open rural areas and are presently in use as grazing or cut-over timber lands. It also appears from the testimony of plaintiff's witnesses that fee title is not needed or required for construction of the contemplated facilities which in these cases will consist only of wires or supporting towers, or both. No buildings, generating plants or other such structures will be erected on the property of any owner involved in these several cases. It further appears the rights of way will remain unfenced and defendant owners will be permitted to farm, graze cattle thereon or utilize same for any similar purpose which does not conflict with plaintiff's use thereof. Admittedly defendants will not be able to construct improvements in the right of way or continue to grow timber thereon as such would present hazards and impediments in the operation, maintenance and repair of the lines. Subject only to those restrictions and limitations, all defendants will retain some use of their properties and in addition, will retain mineral rights therein. Under such circumstances it hardly behooves defendants to urge plaintiff be compelled to expropriate their lands in fee.
Plaintiff maintains the remaining defenses such as alleged abuse of plaintiff's discretionary authority in selection of route, availability of alternate routes and optional methods of construction which will render the proposed construction less dangerous, *373 may not be considered by this court as such issues were not specially and timely pleaded in accordance with the provisions of LSA-R.S. 19:6 and 7. Plaintiff further contends the recitations relied upon by defendants as allegations of such issues are mere conclusions of law, not assertions of fact and, therefore, evidence in support thereof was erroneously admitted by the trial court. LSA-R.S. 19 Sections 6 and 7 provide that a landowner defendant in an expropriation suit shall file his answer within 10 days of service upon him and failure to so answer shall constitute a forfeiture and waiver of all defenses except claims for compensation due either to property taken or as severance damages to remaining property. As correctly pointed out by learned counsel for plaintiff, said provision of our expropriation law has been held to mean that a defendant who fails to timely plead and answer waives all defenses except his right for compensation. State v. Landry, 219 La. 456, 53 So.2d 232; City of Gretna v. Mitchell, La.App., 64 So. 2d 873.
It is unnecessary to consider plaintiff's contentions that defendants have failed to timely plead or have plead conclusions of law instead of facts as the record reveals the testimony relative to the controversial issues of alternate routes and optional methods of construction were received in the trial court without objection or complaint by plaintiff. Having permitted introduction of evidence to which objection may have properly been made, plaintiff has allowed the pleadings to be enlarged to such extent and may not on appeal offer an objection which should have been forthcoming during trial. It is the settled jurisprudence of this state that evidence admitted without objection enlarges the pleadings and may be considered by the court in disposing of the question thereby placed at issue notwithstanding the matter involved has not been timely and specially plead. Smith v. Cook, 191 La. 575, 186 So. 32; Searcy v. Interurban Transp. Co., 189 La. 183, 179 So. 75; Stanley v. Jones, 201 La. 549, 9 So.2d. 678.
In our judgment the foregoing principle is particularly applicable in expropriation suits considering the power of expropriation is in derogation of the fundamental right of free and unmolested ownership of property and that an owner, divested of property rights by expropriation, should be afforded every opportunity to protect his interest therein consistent with law and equity.
Defendants' contention that plaintiff arbitrarily selected the route is without foundation in the record. The circumstances surrounding selection of the route proposed to be followed by plaintiff were related in detail by Morris Steiner, Jr., a civil engineer employed by plaintiff and having considerable experience in the design and lay-out of such facilities. In substance, Steiner testified that in order to determine the shortest feasible route between points of origin and destination, an aerial inspection was made between the places of commencement and termination. Having thusly selected a general route, plaintiff's engineers then secured aerial maps or photographs upon which was plotted as direct and straight a line as possible considering adjustments thereof to avoid municipalities and obstacles such as buildings or structures discernible on the aerial photographs employed. In keeping with better engineering practice the line was purposely maintained on as near a tangent or straight line as conditions permitted to minimize angles therein which increase the length and cost of such lines and reduce their efficiency. After plotting the general route on aerial photographs plaintiff's engineers inspected the proposed course thereof by automobile making additional adjustments to avoid buildings, structures and obstacles not revealed by the aerial photographs. Following this procedure, a firm of consulting engineers was employed to conduct a ground survey of the route and stake out the location of the line on the *374 ground which project was accomplished by one A. J. Register, a licensed surveyor (not however a graduate civil engineer). Register appeared as a witness and attested the fact that numerous adjustments were necessitated and made because of the disclosure of impediments revealed by his survey. He further corroborated Steiner's testimony to the effect that every effort was made at all times to avoid deviations wherever possible and keep the line as short and straight as circumstances allowed. His testimony further shows effort to avoid inconvenience to landowners having improvements on their property whenever such results could be accomplished consistent with good engineering procedure.
Plaintiff concedes its right of expropriation exists pursuant to the provisions of LSA-R.S. 19:2(9) which is a codification of numerous prior expropriation statutes and the applicable portion of which reads as follows:
"(9) Any domestic or foreign corporation created for the purpose of developing and transmitting electricity for power, lighting, heating, or other such uses. The buildings, transmission lines, stations, and sub-stations expropriated or for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere with the use of the wires of other wire-using companies or, more than is necessary, with the convenience of the land-owner."
The first eight paragraphs of Section 2, Title 9, LSA-R.S. grant power of expropriation to the state, political corporations and subdivisions of the state, educational and charitable institutions, railways and certain other utilities and public corporations and bodies other than corporations engaged in the field of electrical utilities and none contain the safety and convenience requirement appearing in paragraph (9).
Plaintiff contends the safety and convenience provisions of the statute from which it derives its authority must be interpreted to relate solely to the reasonableness of the action of the expropriation and the necessity of the taking whereas defendants maintain the phraseology employed must be construed to relate to method of location, construction, maintenance and operation and be interpreted as a restriction upon and limitation of the expropriation power of such utilities. Defendants further argue that expropriation statutes being in derogation and contravention of fundamental property rights must be rigidly construed. Predicated on the foregoing basis, defendants aver in substance that under such rigid construction plaintiff is prohibited from constructing any facility that may in any way endanger the lives or property of landowners and are additionally charged with the burden of avoiding any inconvenience whatsoever to any person whose property shall be expropriated for the construction of such facilities.
Although the property of Jack F. Harang, defendant in Suit Number 5226, is the only tract upon which improvements are situated, all defendants contend the presence of the towers will destroy the esthetic beauty of their respective holdings; that the towers and wires constructed as hereinabove set forth will appear on their landscapes as modern monstrosities of steel and wire instilling terrifying psychological fear in the timorous while simultaneously serving as an attractive nuisance to lure and entice venturesome, curious and daring individuals (especially children) to death or injury. All defendants in general and Harang in particular allude to the possibility of children being electrocuted while in the act of flying kites. They point to the fact that the towers being equipped with means of ascent and descent will serve as a constant and ready challenge to the inquisitive individual who, unsuspecting of the grave danger involved and prodded by an inherent sense of curiosity, may be tempted to scale such a structure and perish in the *375 attempt. Also defendants, in each instance, maintain the presence of such dangerous instrumentalities will substantially diminish the resale value of their respective properties.
In particular defendant Harang asserts the line will pass within 300 feet of his residence thereby endangering not only his property but the lives, safety and welfare of himself and the members of his family. Harang also maintains that since the line will traverse a small lake or pond which he has constructed on his property for recreational purposes, the welfare of his children will be jeopardized while utilizing said facility for boating, fishing, swimming or other recreational pursuits. It further appears Harang will be required to abandon a private airstrip constructed on his property for the accommodation of aircraft employed in the modern farming operations he conducts thereon.
To avert the possible consequences related defendants (particularly Harang) contend plaintiff should be required to construct its facilities underground. Alternatively, defendants maintain the lines should be constructed along their respective property lines to minimize the danger therefrom as well as the extent and area of property affected thereby but not along any highway frontage as the overhanging wires would render such valuable road frontage useless and unfit for commercial purposes. Finally, defendants argue their alternate requests are compatible with obligations incumbent upon plaintiff under paragraph (9) to construct the facilities in the least dangerous manner possible and with minimum inconvenience to each landowner.
There can be little doubt but that plaintiff does indeed possess the power to expropriate defendant's properties subject only to such restrictions as the statute imposes. LSA-R.S. 19:2; Louisiana Power & Light Co. v. Mosley, La.App., 18 So.2d 210; Gulf States Utilities Co. v. Callahan, La.App., 65 So.2d 608; Central Louisiana Electric Co., Inc. v. Pugh, La.App., 96 So.2d 523.
The question presented for determination, namely, the extent of the obligation incumbent upon plaintiff by the limitations and restrictions respecting safety to persons and property and minimization of inconvenience to landowners, is apparently presented to this court as a matter of first impression insofar as the jurisprudence of our own state is concerned.
Regarding the general subject matter of expropriation the jurisprudence of this state has evolved certain fundamental concepts and rules which have been repeated on innumerable occasions. One such cardinal principle is that in the location of rights-of-way considerable discretion is vested in the expropriating authority and the courts will not disturb or interfere with the exercise thereof in the absence of fraud, bad faith or conduct or practices amounting to an abuse of the privilege. 18 Am.Jur. Eminent Domain, Page 735, Section 108; Kansas City, S. & G. Ry. Co. v. Vicksburg, S. & P. R. Co., 49 La.Ann. 29, 21 So. 144; Fuselier v. Police Jury of Parish of Iberia, 109 La. 551, 33 So. 597; Board of Levee Com'rs, Orleans Levee Dist. v. Jackson's Estate, 113 La. 124, 36 So. 912; Louisiana & A. Ry. Co. v. Louisiana Ry. & Nav. Co., 125 La. 756, 51 So. 712; Board of Com'rs of Tensas Basin Levee Dist. v. Franklin, 219 La. 859, 54 So.2d 125; City of Westwego v. Marrero Land & Improvement Ass'n, 221 La. 564, 59 So.2d 885; Greater Baton Rouge Port Commission v. Watson, 224 La. 136, 68 So.2d 901; Wilton v. St. Johns County, 98 Fla. 26, 123 So. 527, 65 A.L.R. 488; City of Charlotte v. Heath, 226 N.C. 750, 40 S.E.2d 600, 169 A.L.R. 569; Johnson v. Consolidated Gas, Electric Light & Power Co., 187 Md. 454, 50 A.2d 918, 170 A.L.R. 709.
It is also well settled that availability of other and alternate routes is of no concern to the property owner whose land is sought to be expropriated provided *376 the location selected fulfills the needs and requirements of the expropriator, meets the standards prescribed by sound engineering and economic practices, is neither arbitrarily nor capriciously chosen, and does not constitute an abuse of the discretionary right of selection. In Kansas City, S. & G. Ry. Co. v. Vicksburg, S. & P. Ry. Co., 49 La.Ann. 29, 21 So. 144, 145, we find:
"The defendant's appreciation of that necessity seems to make the test whether or not the land of others, equally adapted, as it contends, for plaintiff's uses, cannot be obtained. * * * `While we have examined this phase of the controversy, it must seem difficult to maintain, as the test of expropriation, that lands of others than the proprietor should be taken. Expropriation, in most instances, is deemed a sacrifice by the proprietor called on to make the surrender. If one proprietor could defeat the expropriation on the ground that the call should be made on another, the supposed compulsion of the law requiring private property for the public good would be of no efficacy. The necessity, in legal contemplation, that is to be the guide in selecting land for an unquestioned public purpose, is to be understood in a reasonable sense. * * *'"
In Louisiana & A. Ry. Co. v. Louisiana Ry. & Nav. Co., 125 La. 756, 51 So. 712, we note:
"The necessity for the exercise of the right of eminent domain must be understood in a reasonable sense, with due regard to the needs of the plaintiff corporation and all the elements of judicious selection. The objection that other property should be taken furnishes no test for the necessity for expropriation in ordinary cases."
The fact that defendant Harang, a geologist, was able to plot several possible alternate routes on an aerial mosaic of the area is of little comfort to defendants. Obviously, in view of the series of steps and processes engaged in by plaintiff in the ultimate determination of the route as hereinbefore set forth in detail, such initial step of designating a general route on an aerial mosaic is but a preliminary to the entire procedure. The record clearly shows such initial designation does not reveal the existence of obstacles necessitating deviations and detectable only by following the entire procedure outlined by the witness Steiner. Without the successive stages indicated such preliminary choice of route is far from complete and does not reveal the full magnitude of the problems to be eventually encountered. From such testimony alone it is patently impractical to determine the final course of such a line. Unquestionably the only result of selecting either alternate route proposed by defendant Harang would be to cause problems substantially similar to those herein involved to confront property owners other than present defendants.
It is elementary that in all expropriation cases the prohibition against arbitrary, unreasonable, capricious and unnecessary taking is ever present. We conclude the provisions of the statute involved herein address themselves primarily to the question of necessity of taking and reasonableness of the exercise of the discretion vested in the expropriating body. We believe the provision places a somewhat more onerous duty on the present plaintiff but that nevertheless it must be construed with reason. The interpretation urged by defendants, namely, that landowners must be protected against any danger or inconvenience at all costs and in any event, is, in our judgment, unreasonable and would lead but to absurd and illogical conclusions. Such an onus upon plaintiff would completely nullify the power of expropriation sought to be conferred by the statute. To suit, in detail, the convenience of each owner and protect him from all possible danger such as by constructing such transmission lines along the property lines of each individual property owner achieves only the result of complicating *377 the problems of the expropriator by unnecessarily extending the lines and forcing construction not in keeping with better engineering principles. Moreover, to accommodate in full the demands of any given property owner is but to create a problem for his neighbor or some other owner within the path of the proposed structure. To construct the line in question along the extremities of the properties of the defendants herein will compel numerous deviations which will not only increase the cost of line and reduce its efficacy but also render its construction most burdensome, if indeed, not impossible.
The requirement that such facilities shall be located, constructed, operated and maintained so as not to be dangerous imposes the duty of constructing such facilities in conformity with recognized engineering and economic principles and practices. Plaintiff concedes that a line of such voltage will arc a distance of approximately 23 inches so that actual contract therewith is not necessary to produce injury but contends that all such lines will produce an arc the extent thereof being directly related to the current carried therein. Plaintiff also points out the line in question is designed to comply with all safety regulations of the National Electric Code and considering its minimum ground clearance of 35 feet will be no more dangerous than similar lines of less voltage. The testimony is abundantly clear to the effect construction of the line will accord with recommended and approved safety principles and regulations and will be no more dangerous from the standpoint of manner of construction than presently existing structures of like character excepting the proposed line will carry a higher voltage than any other line now in operation. While the line will necessitate abandonment of the airstrip presently operated by defendant Jack F. Harang, such result would ensue because of the presence of any electrical transmission wires irrespective of the voltage involved.
The statute in question does not prohibit the location, construction, operation and maintenance of such a structure merely because it may involve some remote and incidental danger or risk to the landowner but proscribes its location, construction, operation and maintenance in a dangerous manner or in a fashion calculated to materially increase a remote or incidental risk, hazard or danger which might otherwise be reduced or minimized within the purview of sound, approved, acceptable, orthodox and reasonable engineering and economic principles and practices. Such statutes must, within reasonable limits, be interpreted to fulfill the needs of present day science and industry, the growth, development, expansion and improvement of which controls, determines and vitally affects the health, safety, welfare and existence of every citizen in this atomic age. That some remote or possible danger might result from the proposed structure does not bar its erection. The evidence in the case at bar convinces us that every engineering principle which might be employed to reduce danger incident to aboveground construction has been considered by plaintiff. It follows that defendants' contention plaintiff is prohibited from constructing the line was properly rejected by the trial court.
The foregoing interpretation appears in harmony with that of the Maryland courts which in Johnson v. Consolidated Gas, Electric Light & Power Co., 187 Md. 454, 50 A.2d 918, 922, 170 A.L.R. 709, which had under consideration a similar statute providing the expropriation authority must construct its poles in such manner as not to interfere with the convenience of the landowners more than is "unavoidable". In reversing a ruling of the lower court refusing the admission of testimony to prove the line could have been constructed underground the court said:
"The appellee here, under the power of eminent domain, has no right to take private property arbitrarily or utterly *378 at variance with its delegated power and so as to inflict unnecessary damage upon the property owner." * * *
"The Court in passing upon whether the condemnation sought is reasonably necessary is limited in its inquiry as to whether the discretion exercised by the party condemning is honestly exercised. In the case of Murphy v. State Roads Commission [159 Md. 7, 149 A. 566], supra, where condemnation of a road was sought by the State Roads Commission, this Court said at page 18 of 159 Md., at page 571 of 149 A., `The engineers for the commission testified that the sour apple tree route was safer, more economical, and more convenient. While they were contradicted by appellants' witnesses, it is not our purpose to weigh or resolve that conflict, since our reference to the evidence has not been to decide whether the commission exercised the discretion reposed in its wisely, but whether it exercised it honestly. And as in our opinion the evidence clearly shows that the commission did not select the proposed route until it had examined and carefully considered such relevant facts as should have affected its conclusion, we find no abuse of the discretion vested in it, and it will not be reviewed.'
"Unless the discretion of the condemning agency as to reasonable necessity is wrongfully, arbitrarily, or oppressively exercised, that discretion cannot be controlled or reviewed by the Court, State Roads Commission v. Redmiles, 176 Md. 677, 681, 6 A.2d 551. The Courts are not empowered to oppose their judgment to that of the condemning authority. Matthaei v. Housing Authority, supra, 177 Md. [506] at page 514, 9 A.2d 835."
While it is true that constructing the line underground would materially lessen danger therefrom the record shows such method of construction would cost $750,000 per mile as compared with a cost of $26,000 per mile for overhead construction. In addition, it is shown that underground cables would be less efficient and would necessitate additional generating facilities estimated to cost $10,000,000. It further appears that cost of maintenance of underground facilities would be substantially greater than for overhead lines because the location and repair of failures in buried cables is considerably more difficult and expensive. Such costs would, of course, be reflected in the rates charged consumers and would be inconsistent with approved economic practice and principles. We believe no court should impose a charge or limitation of such scope upon a public utility, or burden of such nature upon the rate-paying public, except in those instances attended by conditions and circumstances of an urgency and gravity sufficient to clearly justify the restriction applied.
Plaintiff's right of expropriation in these cases is clear and manifest.
It is also clear that the circumstances of the instant case do not warrant or justify imposition of the requirement that plaintiff construct said line underground or along the boundaries of defendants' properties.
In the case presently under consideration, plaintiff does not complain of the award of compensation in the sum of $2,500 allotted defendant for land taken for the servitude but maintains only the trial court erred in awarding defendant compensation for severance damages in the amount of $2,900. Plaintiff maintains no severance damages are due the present defendant whereas, in answering the appeal, defendant urges an increase in said item from $2,900 to $3,825. Defendant appears satisfied with the award made for the servitude, therefore, with respect to compensation, the sole issue before the court is the amount of severance damages, if any, to which defendant herein may be entitled.
*379 The property herein involved is cutover pine land situated on the north side of Highway 190, the Hammond-Covington Highway, approximately two miles west of Covington, Louisiana, and has a frontage on said highway of 660 feet by a depth in excess of 4,000 feet.
The centerline of the 125-foot servitude required by plaintiff intersects the south boundary of defendant's property (the north right of way line of the highway) at a point 259 feet east of the southwest corner of the tract and extends diagonally across the land in a northeasterly direction a distance of 705 feet crossing and exiting from the property at a point on the east line thereof 480 feet north of its southeast corner. Because of the angle at which the servitude courses it is conceded the width thereof measures 176 feet along the highway. No towers or other structures will be erected on the servitude required of defendant herein which will be utilized solely for the purpose of stringing the necessary overhanging wires through which the electric current will be transmitted.
A radio transmitting station is presently situated on the tract and in current use. All of the witnesses who testified herein concerning the value of the property and severance damages allegedly due for diminution in value of defendant's remaining land, agree the best and highest use and classification of the property is suburban commercial.
It is the settled jurisprudence of this state that in an expropriation proceeding the landowner, in addition to compensation for property taken, is also entitled to compensation for damages to remaining property caused by the use to which the property taken has been put. Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So.2d 260. Such damages are known and referred to as consequential or severance damages. Louisiana Highway Commission v. Treadaway, La.App., 173 So. 209; Tennessee Gas Transmission Co. v. Primeaux, La.App., 100 So.2d 917; Texas Pipe Line Co. v. Barbe, supra.
While damages resulting from inconvenience, discomfort or loss of business are normally damnum absque injuria and not compensable, American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 54 So.2d 4; Louisiana Highway Commission v. Boudreaux, 19 La.App. 98, 139 So. 521; State v. Sauls, 234 La. 241, 99 So.2d 97, such damages, however, are compensable and recoverable to the extent they decrease or diminish the market value of the owner's remaining property. Louisiana Highway Commission v. Guidry, 176 La. 389, 146 So. 1; Opelousas, Gulf & N. E. Ry. Co. v. St. Landry Cotton Oil Co., 121 La. 796, 46 So. 810.
When severance damages are collectible in an expropriation matter, the measure thereof is the difference between the market value of the property for sale or rental purposes immediately preceding and immediately following expropriation. American Tel. & Tel. Co. of Louisiana v. Maguire, 219 La. 740, 54 So.2d 4.
In expropriation proceedings severance damages may be awarded for depreciation of remaining property caused by hazardous conditions resulting from a utility placed on the expropriated property. Tennessee Gas Transmission Co. v. Primeaux, La.App., 100 So.2d 917. Even where no real danger exists compensation may be granted for the mere fear of danger to the extent such psychological deterrent to prospective purchasers reduces the market value of the property remaining. Texas Pipe Line Co. v. National Gasoline Co. of Louisiana, Inc., 203 La. 787, 14 So.2d 636; Texas Pipe Line Co. v. Barbe, supra.
However, severance damages cannot be presumed and unless the owner of the remaining property shows by competent evidence that the value of his remaining land has been diminished by the taking, compensation will be limited to the value *380 of the land actually taken. 10 R.C.L., Eminent Domain, Page 135, Par. 154; Louisiana Highway Commission v. Ferguson, 176 La. 642, 146 So. 319; Central Louisiana Electric Co., Inc. v. Leonards et al., La.App., 65 So.2d 631.
The burden of proving severance damages rests upon the landowner as evidenced by the following appearing in Central Louisiana Electric Co., Inc. v. Leonards et al., La.App., 65 So.2d 631, 632:
"(2) On the question of damages as distinguished from the value of the land or property rights taken, it is well settled that they are the difference between the market value of the property immediately before and immediately after the expropriation, and that mere consequential injury to the owner arising from discomfort, disturbance, injury to business, and the like are damnum absque injuria. Harrison v. La. Highway Comm., 191 La. 839, 186 So. 354; American Tel. & Tel. Co. v. Maguire, 219 La. 740, 54 So. (2d) 4; Louisiana Highway Comm. v. Boudreaux, 19 La.App. 98, 139 So. 521; Vicksburg A. & S. Ry. Co. v. La. A. & R. Co., 136 La. 691, 67 So. 553; Commercial Telegraph Cable Co. of La. v. Prevost, 133 La. 47, 62 So. 347.
"(3) It is also well-settled jurisprudence that damages to lands cannot be presumed in expropriation proceedings, and compensation is limited to the value of the land taken unless the owner shows by competent evidence that the taking diminished the value of his remaining land. Louisiana Highway Comm. v. Ferguson, 176 La. 642, 146 So. 319. In this connection, the burden of proving damages is on the defendant, and such damages must be proved with a legal certainty. Louisiana Highway Comm. v. Boudreaux, cited supra; Murff v. Louisiana Highway Comm., La.App., 146 So. 328, 331."
Proof of severance damages must be certain and positive as distinguished from uncertain, indefinite, speculative, remote or conjectural. In this connection we note the following pronouncement of the Supreme Court in Texas Pipe Line Co. v. Barbe, 229 La. 191, 85 So.2d 260, 267:
"The evidence shows that the best possible use of these lands would be for industrial purposes and that it has not been so used up to the present time. The nearest industry to the lands is some one and one-half to two miles distant. There is no evidence in the record that any one has sought to acquire these lands for industrial purposes. The land is now used for pasturage purposes.
"The evidence as to whether or not the pipe line would depreciate the value of the property adjoining the right-of-way is very conflicting and uncertain. Three licensed realtors and the President and General Manager of Cities Service Refining Corporation, an industry located in the vicinity, testified that the pipe line right of way would not damage or depreciate the value of the adjoining property. On the other hand, two engineers, and one of the defendants, testified that it would damage the adjoining property and render it unsuitable for industrial purposes and make it suitable only for pasturage and farm purposes, thereby reducing its value. These are the only witnesses who testified as to the severance damage.
"The testimony is conflicting and is such that the damage, if any, is speculative and remote. We cannot say from the evidence that this property will ever be used in fact for industrial purposes or that it cannot be so used in the future.
"(11, 12) We are aware of the decisions of this Court allowing damages when there is positive proof of such, *381 but the damages claimed must not be anticipated damages, nor remote or speculative. Louisiana Highway Commission v. Lasseigne, 177 La. 440, 148 So. 672; Louisiana Highway Commission v. Paciera, 205 La. 784, 18 So. (2d) 193; American Tel. & Tel. Company of Louisiana v. Maguire, 219 La. 740, 54 So. (2d) 4; State of Louisiana Through Department of Highways v. Glassell, 226 La. 988, 77 So. (2d) 881. Therefore, under the circumstances, we cannot say that the defendants have proven by a preponderance of evidence that the adjacent lands would be damaged by the pipe line right of way."
Defendant's contention it is entitled to severance damages to the remainder of its property is predicated upon the assumption the highway frontage thereof which is commercial to a depth of 780 feet will be reduced in value whereas the rear thereof, which is suitable for residential subdivision development will suffer a reduction in market value because of the presence of the lines.
All of the experts who testified concerning the value of the property in question agree its best and highest use is commercial in view of which severance damages to the remainder, must be determined in the light of its sale or rental for such purpose.
The record reveals the property has a frontage of 660 feet on the north side of Highway 190 and because of the angle at which the servitude runs a total of 176 feet of said frontage is included within the easement sought by plaintiff. It further appears the centerline of the right-of-way crosses the south boundary of defendant's property at a point 259 feet east of its western boundary and 401 feet west of its eastern boundary. The highway frontage involved in the servitude being 176, by simple arithmetical calculation, it follows that, measured along the highway, the distance from the centerline of the servitude to the eastern and western limits or extremities thereof is 88 feet in each instance. From the foregoing it necessarily follows that to the east of plaintiff's right-of-way defendant has remaining a triangular shaped parcel of land fronting on the highway, the base of which (the southern boundary of the property) measures 313 feet (401 feet minus 88 feet) and to the west of the servitude defendant has remaining 171 feet of highway frontage (259 feet less 88 feet).
In support of its claim to severance damages defendant in the instant case (as did defendants in the other matters consolidated herewith) offered the expert testimony of Randy Powell, age 49 years, who is a resident of Covington, Louisiana, and has been engaged in the field of real estate for a period of 12 years. His experience has been principally in the vicinity in which the various properties sought to be expropriated are situated. Powell appraised defendant's highway frontage as commercial property valued at $15 per front foot to a depth of 780 feet. He considered the remaining portion thereon diminished in value to the extent of $4,725. In Powell's opinion the property was more commercial than residential considering the location thereon of a radio transmitting station which he felt established the character and use of the land. He also felt the remaining frontage to be depreciated approximately one-half its value or $7.50 per front foot. The remaining property in the rear he considered depreciated in value to the extent of $30 per acre. He believed the road frontage depreciated on the ground it would be more difficult to sell because of the servitude thereon. Because of the availability of highway frontage for sale in the market he felt a prospective commercial user could afford to be more selective in his choice of location and therefore would not purchase near a high-voltage line if other sites, unaffected by such facilities, were to be had. He conceded the presence of the line would not be as serious a deterrent to a commercial user as to a homeseeker but believed that because of the line there would be some sales resistance even on the part of a commercial user. Powell also believed that interference *382 with radio and television reception created by the line would seriously affect the resale value of the remaining rear property as homesites or residential lots.
Frank Patecek, realtor, was also called as an expert in the field on defendant's behalf. Mr. Patecek who is 47 years of age has lived his entire life in Covington, Louisiana, and has been engaged in real estate sales and appraisals for seven years. Patecek estimated severance damages at the same rate as Powell, namely $7.50 per foot for the highway frontage and $30 per acre (10% of its appraised value of $300 per acre) for the back portion of the tract. He considered the frontage remaining east of plaintiff's servitude would be difficult to sell for commercial purposes because it is triangular in shape and for the further reason that to a depth desired by most commercial users it is burdened with the servitude.
Philip Burns, Secretary-Treasurer of defendant corporation, himself a large landowner in St. Tammany Parish, in his testimony offered on behalf of defendant, stated the road frontage remaining east of the servitude would be depreciated to the extent of $5,260, that remaining west of the servitude would suffer diminution in value in the amount of $3,020 and the remaining back property would lessen in worth in the sum of $1,750.
In the instant matter as well as in all cases consolidated herewith, plaintiff called as expert witnesses Edward Deano and Robert Baldwin. Mr. Deano, a licensed realtor and resident of Mandeville, Louisiana, has been engaged in real estate sales and appraisals since 1941. He is experienced in real estate sales and appraisals in both St. Tammany and Orleans Parishes and has been a member of the real estate boards of said parishes since 1948. He has successfully completed two courses of study prescribed by the American Institute of Realtors and Appraisers and recently completed appraisal of the right of way for the north portion of the Greater New Orleans Expressway scheduled for construction in St. Tammany Parish.
Mr. Baldwin has been engaged in real estate sales and appraisals in Slidell, Louisiana, for a period of 12 years. His experience has been principally in the eastern portion of the parish but he unquestionably possesses some background and knowledge of values throughout the parish in general.
In the case at bar and all matters consolidated herewith, counsel for defendants strenuously urges the testimony of Deano and Baldwin should be completely disregarded as incompetent because they are admittedly from sections of the parish removed from the area in which subject properties are located. He further argues their testimony in the various cases is conflicting, contradictory and indicative of a lack of knowledge of real estate values in the area involved. In particular, in the Harang case, Number 5226, defendant contends that since the record shows neither Deano nor Baldwin actually went upon the property but made their appraisals by perfunctory examination thereof which in the case of Deano consisted simply in walking the lines and in the case of Baldwin viewing the land from adjoining property, their testimony should be entirely ignored.
We do not share learned counsel's view that the record reflects a complete lack of knowledge and skill on the part of plaintiff's witnesses, Deano and Baldwin. The evidence shows both said witnesses have had numerous years of experience in real estate sales and appraisals in St. Tammany Parish. The degree of their proficiency, as in every case, must be viewed in the light of their aggregate training and experience and the nature of the investigation or examination upon which their appraisals in each case are based. The circumstances alluded to by learned counsel do not render the testimony of said witnesses either inadmissible or incredible but address themselves solely to the weight to be accorded thereto.
*383 In substance, Deano and Baldwin each valued the servitude taken at $2,000 and appraised the highway frontage at $10 per foot. The rear portion of the property they valued at $500 per acre. They considered the highest and best use of the land to be commercial and did not feel the rear or back portion would suffer any diminution in value whatsoever because of the presence of the line. Because of the nature and location of the tract they considered it had no value as a potential residential subdivision.
In support of its contention the presence of such a high-voltage line would decrease market value of their remaining properties, each of the defendants in these consolidated cases introduced certain testimony tending to show the proximity of such facilities would serve as a deterrent to the purchase of their adjacent and adjoining lands whether suitable for residential or commercial purposes. In this regard the evidence alluded to seeks to establish two basic tenets or concepts. Firstly, it is contended the presence of the wires and towers will constitute an ever present reminder of danger sufficient to dissuade and discourage the normal purchaser from locating either a home or commercial enterprise in proximity thereto for fear of possible danger therefrom to himself, his family and patrons or customers. Secondly, defendants take the position the remainder of their properties (all of which are asserted to be suitable for residential subdivision development) will be rendered less valuable for such purpose because of radio and television interference which will be generated by the line as a consequence of which the properties will be less desirable for residential homesites and suffer a diminution in value for such use.
Defendants introduced the testimony of a graduate consulting electrical engineer, J. N. DeNeil, who is 66 years of age and holds both a Bachelor and Master's degree in the field conferred by Loyola University of the South in the years 1922 and 1924, respectively. Mr. DeNeil has been employed as consultant for the past seven years prior to which he was employed by the Federal Communications Commission as a radio engineer for 28 years, his duties in said capacity consisting in the making of field intensity measurements to determine and detect the coverage of radio broadcasting stations. Mr. DeNeil, a member of the American Institute of Electrical Engineers for approximately 28 years, explained that field intensity tests are made near electrical lines because in proximity thereto field intensity deepens considerably (from 25 to 75 per cent in his estimation), which in lay terminology means signals near such lines become weaker and fainter than in other localities the same distance away from the point of origin but unaffected by electric transmission lines. According to Mr. DeNeil, if he were erecting a television antenna he would prefer to locate it at least 300 feet distant from a line of the character contemplated by plaintiff herein. He also believed that the fact that the line in question would arc a distance of approximately 23 inches would further adversely affect radio and television reception on both sides of the lines to a distance of 300 feet. Over the objection of counsel for plaintiff he was permitted to express the opinion that the presence of the line would reduce the value of defendants' remaining properties. Regarding the effect on television reception he stated the line casts a "shadow" a distance of 300 feet on each side and would materially lessen picture quality within that distance. He stated that present television signals in the area are not very good because of remoteness from the nearest station which is situated in New Orleans, Louisiana. On this basis he was of the opinion interference would be so great as to completely discourage the would-be viewer. On cross-examination, however, Mr. DeNeil conceded the interference he mentioned would not occur while the line was in proper operation and order but would result only in the event of development of a defect therein and would *384 cease upon remedy or correction of the disorder. He further admitted that the condition in question would affect the value of remaining properties only as homesites and would have no adverse effect upon those properties suitable only for other purposes such as farming or cattle grazing.
Defendants next introduced the testimony of Mr. Preston Houk who is 34 years of age, holds a B. S. degree in physics conferred by Southeastern Louisiana College, Hammond, Louisiana, and has been engaged in radio and television sales and service since 1947. In his experience he has encountered difficulty in the vicinity of a 24,000-volt line in this same general area. On one occasion his reporting of complaints to plaintiff resulted in an investigation which disclosed radio and television interference emanating from cracked insulation involving two lines which plaintiff declined to repair because the cost of said repair was estimated at $250 per line. To his knowledge, the defect discovered two years previously, has never been repaired. In substance, he testified that in his experience television signals are adversely affected within 300 feet on either side of a power line, the effect on picture transmission being greater than that on sound. According to Houk he experimented with a television receiver situated within 60 to 70 feet of a power line and giving trouble and found that when he moved the set a distance of 300 feet or more from the line the difficulty disappeared.
The realtor Powell testified that he had some experience selling residential properties traversed by smaller electric lines of the pole line type and character so frequently seen about the countryside but his testimony in this regard was somewhat vague. He was of the opinion the mere presence and sight of the line in question and the fear of danger and radio and television interference therefrom would create considerable sales resistance in prospective purchasers and render these properties difficult to sell. Based on the testimony of DeNeil and Houk, he considered the element of television interference alone would depreciate all properties within 300 feet of either side of the line.
Defendant's witness, Patecek, having admitted no experience selling property adjacent to electric transmission lines was permitted, over plaintiff's objection, to testify that in his opinion the presence of the lines will have a "psychic effect" upon prospective purchasers who will not only fear its potential danger but would not purchase a homesite within 300 feet thereof because of the possibility of interference with television reception. He was of the opinion the psychic effect would be present even beyond the 300-foot distance and would serve as a sales deterrent for residential purposes.
Learned counsel for plaintiff strenuously urges our complete disregard of the testimony of Powell and Patecek on the issue of severance damages allegedly resulting from the presence of the line because of certain inconsistencies therein and the admitted lack of experience on the part of said witnesses with regard to sales of residential properties situated near similar installations. In this connection counsel points out among other things, that in the case at bar in which the line crosses the most valuable portion of the property (the road frontage) Powell and Patecek found less damage to remaining property than in the Stiegler cases, 5221 and 5222, in which no road frontage is involved. Learned counsel also points to the apparent inconsistency in which said witnesses in the instant case and two Stiegler cases express the opinion the entire remainder of the tracts will suffer depreciation whereas in all other instances they are of the opinion severance damages will be restricted to that portion of the remainder within 300 feet of either side of the line.
The same rule of law applicable to defendants' castigation of the testimony of plaintiff's witnesses Deano and Baldwin governs, with equal force plaintiff's objection *385 to the testimony of Powell and Patecek. The matters referred to by counsel for plaintiff do not concern the admissibility of their testimony, merely the weight thereof.
In rebuttal of the testimony offered by defendants with regard to the effect of the line on radio and television reception, plaintiff offered the testimony of its engineer, Morris Steiner, who testified that in his work for plaintiff he has had considerable experience in installing and testing radio equipment and in the conduct of radio detection tests for plaintiff's customers, including detection and elimination of reception interference. He stated the "shadow effect" to which DeNeil referred is unrelated to voltage but is dependent upon the number of wires in the line and the nature of the material in the receiver. He further stated the same "shadow effect" referred to by DeNeil may be produced by other obstructions such as buildings, trees or similar objects. In addition he expressed the opinion the quality of a given set will affect its "sensitivity" or degree to which it will be affected by shadow from any source.
Plaintiff next produced the testimony of one Allen P. Gross, who stated that in the year 1952 he purchased an 8½-acre tract of land fronting on a highway approximately 2½ miles from Slidell, Louisiana. Despite the fact the property is crossed by a power line (admittedly less than 230,000 volts) he has subdivided the land into 43 residential lots measuring 50 × 134 feet in area, nine of which are traversed by the power line mentioned. He has since disposed of one lot over which the line passes having received $200 therefor and has sold four lots adjoining sites traversed by the line for the price and sum of $300 each. On the front of his property Gross operates a cafe and utilizes the adjacent power line right of way for a parking area which will accommodate approximately 150 automobiles. The remaining lots sold from the subdivision thus developed have brought the sum of $300 each excepting two front lots which sold for $600 apiece. According to Gross there are homes in his subdivision with yards adjoining a power substation constructed on the adjacent right of way. The occupants of these homes and others situated within the subdivision as well as Gross's restaurant all have television sets.
Finally, on the issue under consideration, plaintiff introduced the testimony of Lois King Wiggins, a resident of Metairie, Louisiana, who testified that she is employed in the capacity of saleslady by one Shell, a realtor. Her experience in the field includes three years such service in Alaska, one year in the State of Florida and three years in New Orleans, Louisiana. She testified that in a period of nine months she sold 105 homes for her present employer, Shell, and is presently engaged in selling homesites in a residential subdivision, in or near Metairie, known as Magnolia Gardens, and adjoining an electrical transmission line. She explained that Magnolia Gardens Subdivision contains 126 residential plots laid out 63 on either side of a street known as Davis Drive. On one side of Davis Drive the lots measure 60 × 122 feet and are bounded in the rear by the right-of-way on which is situated a high-voltage transmission line, not of the ordinary pole line type or variety but containing supporting towers approximately 80 feet in height. Despite the fact the wires of said line are 100 feet from the rear of the lot lines and the servitude abutting said subdivision is occupied by one or more towers, all lots adjoining the line have been sold and some homes have been built adjacent to the right of way.
From the foregoing it will be readily observed the evidence in these consolidated cases regarding diminution in value to remaining properties allegedly suitable for homesite development is conflicting to say the least.
While in our own everyday knowledge we are aware that there is, at least at *386 times, interference from electrical transmission lines and to some degree, a latent fear of such facilities, we are also aware of many instances in which first-quality residential subdivisions have either been developed adjacent to or traversed by transmission lines of similar character without serious adverse sales effect to the subdivision as a whole.
Viewed in the light most favorable to defendants herein we conclude that the record falls far short of establishing with legal certainty the entirety of their respective remaining properties will be diminished in value because of the proximity of the proposed line. In our judgment, at best, the evidence in these cases discloses the mere possibility of decreased values of undetermined extent and amount to residential homesites which might be developed on properties situated within 300 feet of plaintiff's line. We find absolutely no substantial evidence in these records on which even the mere possibility of such damage could be predicated with respect to properties situated more than 300 feet distant from plaintiff's lines. Moreover, assuming, arguendo, damage to properties within 300 feet were adequately and sufficiently proven, to recover therefor, it then becomes the duty of each defendant to prove subdivision potential is reasonably immediate and likely to occur in the reasonably near future.
It will be recalled we herein previously stated the burden rests upon defendants to offer positive proof of severance damages claimed which means not only proof that the damages do in fact exist but also the nature, extent and amount thereof. The estimates of defendant's experts, Powell and Patecek, respecting severance damages to alleged remaining residential subdivision properties in each of these cases was admittedly an uncorroborated opinion unsubstantiated by experience in dealing with similar conditions and situations. When requested to give the basis for their opinions on this score neither could advance any sound, logical or reasonable rule, tenet, theory, principle or precept therefor and, in effect, contented themselves with stating that in their opinion the damages in each case would be the amount stated. On the basis of such testimony severance damages (even to properties within 300 feet of the line) could only be presumed in these cases.
Establishment of the mere possibility of severance damages is not sufficient basis upon which to predicate an award therefor. Defendant in the instant case (as well as defendants in all cases consolidated herewith) have failed to establish severance damages of the nature hereinabove discussed with that degree of certainty required by law and consequently may not recover therefor.
We find, however, that some of the landowners involved in these suits are entitled to severance damages based upon considerations other than those hereinabove discussed in this opinion. Each said instance will be separately adjudicated in the related decisions which follow.
Although we conclude the present defendant is entitled to no severance damages as respects its remaining property in the rear of its tract, we are of the opinion defendant is entitled to severance damages based on diminution in value of its highway frontage remaining east of plaintiff's servitude.
As herein previously shown, defendant is left with a triangular shaped parcel of land situated east of plaintiff's right of way and having a front of 331 feet along the highway. The centerline of plaintiff's right of way traverses said triangle from zero feet (its point of entry at the highway) to a depth of 480 feet (the point at which it intersects defendant's east line and leaves defendant's property). Unquestionably the market value of this remaining portion of defendant's land which is admittedly commercial in nature is decreased, diminished and depreciated by the presence of plaintiff's servitude thereon. As pointed out by defendant's experts, the greater portion of said triangle, if indeed not all thereof, if *387 sold to a depth sufficient to accommodate the ordinary and normal type of roadside commercial establishment commonly found beside our modern highways, will be entirely or partially burdened by plaintiff's right of way within the limits of which no building or structure may be erected. While it is true that a commercial user of the highway frontage might employ the servitude area for certain purposes such as parking automobiles or other usage compatible with plaintiff's employment thereof, nevertheless, any user will countenance serious restrictions and limitations in the placement of buildings and improvements to the extent impairment of the market value of said remaining commercial property is readily apparent. The decrease in value to said property for commercial purposes resulting from the instant taking is certain, positive, definite and obvious. It is neither speculative, conjectural, remote or indefinite. On the contrary, it is certain, clear and imminent and may therefore serve as the basis for an allowance of severance damages herein.
Plaintiff's witnesses valued the frontage at $10 per foot, defendant's witnesses placed its worth at $15 per foot and the trial court ascribed its price at approximately $14.50 per foot considering it awarded defendant $2,550 for 176 feet of frontage taken. We believe the record herein fairly indicates diminution of approximately one-third of the value awarded by the trial court will result from the taking herein and accordingly will fix the severance damages to said parcel of land at $4.50 per front foot or $1,408.50.
We find, however, a different situation with respect to the frontage remaining west of plaintiff's right of way which, it will be recalled, measures 171 feet along the highway and is entirely free and clear of the servitude to the extreme rear depth of defendant's property. We disagree with defendant's experts who contend this frontage will likewise suffer a depreciation in market value because of its proximity to plaintiff's line. We believe the presence of such wires in the approximate center of an adjacent servitude of this nature will serve as no deterrent to a prospective purchaser for commercial use. We further believe a frontage of 171 feet between approximate parallel lines, free of the servitude to whatever depth a purchaser may desire, will be as easily salable for commercial purposes as any other commercial location in its immediate vicinity. Such dimensions will easily accommodate the average roadside commercial establishment and in our opinion will suffer no diminution in market value.
In view of the opinions herein expressed, the judgment of the trial court is hereby amended by reducing the award of severance damages allotted defendant Covington & St. Tammany Land & Improvement Co. from $2,900 to the sum of $1,408.50 and in all other respects affirmed.
Amended and affirmed.