KNOLL, Justice,
dissenting.
| lAlthough I agree with the majority a public and necessary purpose does exist for access to the Shintech valve site for compliance with federal maintenance and inspection regulations, I believe the majority’s expropriation analysis, though based solidly on this Court’s jurisprudence, is flawed in its blatant and utter disregard for the clear and unambiguous statutory language mandating not only a public and necessary purpose, but also the proposed property be needed and necessary for the expropriation. For the following reasons, I respectfully dissent.
Under our constitution, “[ejvery person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property,” which right is subject to reasonable statutory restrictions and the reasonable exercise of the police power. La. Const. art. I, § 4(A). The constitution guarantees “[pjroperty shall not be taken or damaged by any private entity authorized by law to expropriate, except for a public and necessary purpose and with just compensation paid to the owner.” La. Const. art. I, § 4(B)(4)(emphasis added).
By statutory law, a common carrier pipeline company, such as ExxonMobil in the present case, is authorized to “expropriate needed property” when a price can *203 not be agreed upon with the owner. La. Rev.Stat. § 19:2(8) (emphasis added). Our law specifically allows:
All persons included in the definition of common carrier pipelines[1] as set forth in R.S. 45:251 have the right of expropriation with authority to expropriate private property under the state expropriation laws for use in its common carrier pipe line business, and have the right to lay, maintain and operate pipe lines, together with telegraph and telephone lines necessary and incident to the operation of these pipe lines, over private property thus expropriated, and have the further right to lay, maintain and operate pipe lines along, across, over and under any navigable stream or public highway, street, bridge or other public place, and also have the authority, under the right of expropriation herein conferred, to cross railroads, street railways, and other common carrier pipe lines by expropriating property necessary for the crossing under the expropriation laws of this state.
La.Rev.Stat. § 45:254 (emphasis added). By the clear and unambiguous language of this statutory law the property to be expropriated must be both needed and necessary, and the party upon whom the burden to establish both the need and necessity of the property should logically be the expropriator.
The majority and this Court’s jurisprudence, however, erroneously relieve the expropriator of this burden, transferring it to the landowner, whose constitutional right to undisturbed ownership of property is divested, and, more significantly, expanding the privilege conferred by statutory law. As the law now stands, all the expropriator must prove is a public need in the expropriation by a preponderance of the evidence. Recreation and Park Commission for Parish of East Baton Rouge v. C & S Development, Inc., 97-2652, p. 3 (La.7/8/98), 714 So.2d 706, 707 (Knoll, J., not on panel). The extent and location of the property to be expropriated are within the sound discretion of the body possessing the power of eminent domain, and these determinations will not be interfered with by the courts if made in good faith. Greater Baton Rouge Port Commission v. Watson, 224 La. 136, 140, 68 So.2d 901, 902 (1953). “Once the expropriating agency has met its burden with regard to public need, the burden shifts to the defendant to show that the agency has abused its | sdiscretion in selecting the site to be expropriated.” Recreation and Park Comm., 97-2652 at p. 3, 714 So.2d at 707. The landowner must prove an abuse of discretion by showing the expropriator acted in bad faith, without adequate determining principles or without reason, or by demonstrating the agency acted without considering and weighing the relevant criteria, namely, the availability of alternate routes, costs, environmental factors, long-range area planning, and safety considerations. Id.
In my opinion, this analysis is wrong and does not reflect a proper balance of the landowner’s constitutional right to property with a common carrier pipeline’s statutory authority to expropriate property. Moreover, this analysis does not comport with the strict construction of these relevant statutory provisions required by law given “the power of expropriation is in derogation of the fundamental right of free and unmolested ownership of property and that an owner, divested of property rights by expropriation, should be afforded every *204 opportunity to protect his interest therein consistent with law and equity.” Central Louisiana Electric Co., Inc. v. Covington & St. Tammany Land & Improvement Co., 131 So.2d 369, 373 (La.App. 1st Cir.1961). In light of the derogatory nature of expropriation, the burden should never shift from the expropriator to the landowner until the expropriator has demonstrated it acted in good faith, with adequate determining principles, and with reason, which can be established by proving its selection was guided by the relevant criteria. Significantly, in my view, these criteria should be considered from both the prospective of the expropriator as well as the landowner, whose property is subject to the expropriation.
In the present case, ExxonMobil seeks to expropriate Union Pacific’s property to place two at-grade crossings over Union Pacific’s tracks for the completion of a road to access, inspect, and maintain its Shintech valve site. Federal regulations | ^ require bi-yearly inspections and a mechanical inspection every five years. Monthly inspections are performed in compliance with ExxonMobil’s own internal policies. At trial, it was revealed both the monthly inspections and bi-yearly inspections have been performed by ExxonMobil employees, who merely walk to the site with the necessary hand tools required to perform the inspections. The inspection every five years would require the dropping of a PIG into the valve, which process takes about two hours. The delivery of the PIG would require a cherry picker, which weighs about 40,000 pounds and is transported by eighteen wheeler, as well as a flare trailer.
At trial, two routes of access to the site were proposed. The route east of the valve site (desired route), which would need to cross the Union Pacific track, was selected by ExxonMobil’s Senior Right-of-way and Claims agent, Paul Saltaformag-gio, and was about 1200 feet in distance. The alternate LA 1 route, proposed by Union Pacific, would allow access to the valve site through ExxonMobil’s existing servitudes from LA 1 and was about 2500 feet in distance.
Admittedly, Saltaformaggio testified he took into account the relevant criteria in determining the best route for the access road:
Okay. Well, when I looked at whether it was possible to come off of LA 1 I quickly discounted that because there’s an existing Shell valve station up there that would require access to be right on top of two pipelines. LIG’s pipeline is approximately five feet off of our pipeline. Louisiana Interstate Gas has a pipeline there. There’s no driveway that actually puts you perpendicular to LA 1. I felt like that that’s a fairly hazardous way to access your right-of-way is off of a busy intersection that you’d have with LA 1 with the railroad being there and a bridge embankment there. You’d have to actually stop on the highway to get your equipment, truck, trailer with a big piece of equipment off of it. So I just discounted coming off of there. I looked if there was any other roads from, that you could come off of LA 1 that existed that would intersect into the right-of-way at different locations. I looked at habitat. I knew from looking at a prior delineated wetland’s report on the Shintech end that the habitat was very similar. And that because I had been involved with permitting for twenty-something-years I didn’t see much differential between the habitat toward LA 1 versus going back toward the Shintech plant. So to me, it was gonna be more of an impact 1 ¡¡to the wetlands; there were numerous utilities; you can’t put a road directly on top of a *205 pipeline, that’s an industry standard that we don’t do, it’s not a safe practice. And so, therefore, after I looked and eliminated any roads that would’ve came off of some other way to get into the right-of-way there close to where our pipeline tie-in was I came in through Georgia Gulf, I came in through Air Liquide and when I got up to this location right here (indicating) at this crossing, this spur crossing there there is a culvert on this side and there’s a culvert on this side where people have used that as a road across that spur track.
However, a review of the trial testimony in its entirety reveals Saltaformaggio merely paid lip service to the relevant criteria and made his determination based on his observations after “walking the routes,” the appearance of an informal crossing, and his previous interactions with Union Pacific. As demonstrated through discovery, there were no reports, documents, or emails regarding the selection of this route. Consequently, we are left with merely his testimony regarding his “beliefs” concerning the various factors, which does not establish ExxonMobil’s selection was made in good faith, with adequate determining principles, and with reason or was guided by the essential criteria.
Although concerned with the “impact” on wetlands, i.e., the environmental factor, Saltaformaggio testified he did not procure a wetlands delineation. Notably, Union Pacific’s expert in wetland delineation, Scott Nesbit, testified even though the desired route was over a thousand feet shorter, there was no environmental advantage to having a route east or west of the valve site, as the impact would be insignificant either way.
As to safety, Saltaformaggio expressed concerns about the LA 1 route with the placement of the road on or next to its pipelines, particularly regarding the undue weight on the pipeline buried about three and half feet deep, with the congestion of utilities, with the two ditches along the route, and with the use of LA 1. However, he did not and admittedly could not even consider the safety implications to Union | (¡Pacific and its railway track because he did not know what services Union Pacific provided to Georgia Gulf and Air Liquide, its two online customers at the time of trial. These services actually entail the daily transporting of hazardous materials, specifically, “vinyl chloride monomer, phenol, caustic, and in some cases chlorine,” by two trains manned by two crews. Paul Rathgeber, Union Pacific’s industry and public project manager, testified in detail regarding the safety issues from the railroad’s perspective and past experiences with ExxonMobil at these types of at-grade crossing:
We had one in Beaumont, Texas actually with ExxonMobil that was suppose to be a temporary used crossing, it has requirements in the agreement that we agreed to that required that it have a locking gate that remains locked except during the use, which is the specific vehicle traveling over, and that they have their own flag person present to ensure safe movement across the track and that they maintain vegetation for a sufficient distance. They have never locked that gate; they never maintained the vegetation, and they never had a flagman until they had a fatality at the crossing when it was not supposed to be used. And they then went out and maintained the vegetation and had a flagman for a couple of months, which has gone away and they still refuse to lock the gate.
He also discussed the national policy trying to restrict or reduce at-grade crossings.
*206 Notably, the desired route would cross two other pipelines, the permission for which crossings ExxonMobil had not obtained prior to trial. Utilities run on both sides of the valve site. Moreover, Union Pacific’s civil engineer, Ronald Ferris, testified he knew of no engineering practice or standard that prohibits the construction of the desired road over buried pipelines. As to the specific weight concerns of the alternate LA 1 route, according to Salta-formaggio, a “Pieces report,” which factors in wall thickness, depth of cover, age of pipe, grade of pipe, amount of fill, and amount of limestone, could have been conducted for weight determinations and would need to be done to obtain permission from the other pipeline companies |7for the crossing of their pipelines on the desired route. However, no such report had been done prior to trial. Interestingly, Rathgeber testified locomotives weighing over 400,000 pounds and tank cars weighing around 300,000 pounds are allowed to cross pipeline for a flammable commodity buried at a depth of 4½ feet below the bottom of the rail.
Additionally, regarding the use of LA 1 for the unloading of the cherry picker every five years, there was trial testimony the railroad has successfully unloaded comparable equipment onto LA 1 with a temporary permit to block traffic under the direction of the State Police. Saltafor-maggio’s testimony also seemed to imply the use of State Police in emergency situations.
Likewise, Saltaformaggio could not have taken into consideration the long-range area planning of the railroad, which was about to begin servicing Shintech and was engaged in a remodeling and refabrication of its track for this purpose. Saltaformag-gio also could not testify regarding the cost of the alternate route, a route he did not even consider, because he did not speak with ExxonMobil’s servitude providers regarding the expansion of its servi-tudes, he did not meet with any engineers to discuss the possibility of building bridges over or culverts in the ditches, he did not procure a wetlands delineation, he did not order a Pieces report, and he did not meet with anyone regarding the procurement of a servitude off of LA 1 or the use of Shell’s driveway. He most definitely could not testify to the cost implications for the railroad due to the interruption of its services and issues with car storage.
Saltaformaggio did, however, make a determination the desired route was the most convenient, but convenience is not the appropriate standard. In my opinion, Exx-onMobil did not demonstrate by a preponderance of evidence the need or necessity of the crossing or the desired route was selected based on adequate | ^determining principles or criteria considered from both sides of the expropriation.
Regardless, the necessity of the expropriated property should be considered a factual determination, just like the determination of the suitability of the proposed property. Greater Baton Rouge Port Comm., 224 La. at 141, 68 So.2d at 902 (“the suitability of the property sought to be expropriated for the purpose as stated is primarily a question of fact”). As a finding of fact, this determination should not be disturbed unless manifestly erroneous.
In the present case, the district court clearly found the property sought as well as the desired route were not necessary because “Exxon has a servitude and every servitude I read the right to construct, maintain, inspect, operate, protect, replace, repair, everyone of your servitude’s has that. And you’re saying I want another servitude to go inspect it and repair it and maintain it. You had one. You got the whole length of it. You even got a[new] *207 one which is even wider than the other one.”
In his reasoning, the district court was particularly interested in ExxonMobil’s federally mandated obligation to maintain and repair its existing pipeline, an obligation ExxonMobil has had for the last twenty-eight years and the performance of which could entail the need for and use of heavy machinery or equipment equivalent to or greater in weight than the 40,000 pound cherry picker needed for the PIG. The District Court focused intently upon the fact ExxonMobil has been able to meet this obligation and remain in compliance with federal regulations for the past twenty-eight years, asking Saltaformaggio: “Before you ever built this valve site, for this existing eight-inch ethylene line for the last twenty-eight years you have had and retained an obligation to be able to get whatever equipment is necessary to repair that line to that location, is that not correct?” To this Saltaformaggio replied: “We’ve had |flan obligation to be able to, if there’s an event out there, to be able to go out there and make a repair, that’s correct.”
The district court specifically questioned ExxonMobil’s ability to repair its pipeline in eases of emergency with the assistance of the State Police in getting access and equipment to the site. He apparently reasoned the servicing of the valve every five years for a two-hour period of time could be accomplished in a manner comparable to the servicing of the line in an emergency. In light of this reasoning, the district court did not find ExxonMobil demonstrated the need or necessity of the desired crossing or route. The district court clearly concluded the authority and ability Exx-onMobil had to have as required by federal regulation under its existing servitudes to service its pipelines in an emergency and for maintenance and repair purposes necessarily encompassed the authority and ability to service the valve site every five years.
In conclusion, with all due respect I find I must dissent from my Brethren. Rather than affirm, we should use this case to correct the erroneous interpretation that has crept into our jurisprudence through the years of improperly shifting the burden on the landowner to show the common carrier has not established a need and necessity; this burden clearly rests with the one requesting the expropriation. With this opinion, the majority now blesses this erroneous interpretation, and in my view, lowers the bar for the taking of one’s property for the sake of convenience.
Moreover, I find the majority clearly fails to demonstrate the trial court committed manifest error given the factual basis supported by the record for its findings. The record easily demonstrates a reasonable basis for the trial court’s ruling and its ruling was not clearly wrong.

. Throughout Chapter 5 of Title 45 of Louisiana Revised Statutes, the term pipeline is spelled “pipe line.”