191 So.2d 761 (1966)
GULF STATES UTILITIES COMPANY
v.
Carl Edward HECK et al.
No. 6587.
Court of Appeal of Louisiana, First Circuit.
February 28, 1966.
On Rehearing September 26, 1966.
Rehearing Denied November 9, 1966.
Writs Refused December 12, 1966.
*763 John C. Christian and F. Frank Fontenot, of Milling, Saal, Saunders, Benson & Woodward, New Orleans, Middleton & Templet, Plaquemine, for appellants.
Samuel C. Cashio, Maringouin, Louis D. Curet, of D'Amico & Curet, Baton Rouge, Landry, Watkins, Cousin & Bonin, New Iberia, Robert L. Roland, of Watson, Blanche, Wilson, Posner & Thibaut, G. Dupre Litton, Baton Rouge, amici curiaæ.
William A. Norfolk and Frank W. Middleton, Jr., of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, Charles O. Dupont, Plaquemine, for appellee.
Before ELLIS, LOTTINGER, LANDRY, REID and BAILES, JJ.
LOTTINGER, Judge.
This is a suit for expropriation of a right of way for the construction of electrical transmission lines over and across the property of the defendants. The petitioner is Gulf States Utilities Company, a Texas corporation authorized to do and doing business in the State of Louisiana. The defendant appellants are Carl E. Heck, and other members of the Heck family.
By virtue of this proceeding, the petitioner seeks to expropriate a right of way running for a distance of 2543.7 feet through the property of the defendants. The width of said right of way sought is 170 feet, or 85 feet on each side of the center line. The property belonging to the defendants, and upon which the right of way is sought, comprises Sections 12 and 13 of Township 9 South, Range 11 East, in the Parish of Iberville, State of Louisiana.
The price of the right of way offered by petitioner, as set forth in the petition, is the sum of $2,383.20 for the servitude. No consequential or severance damages have been offered.
Prior to the filing of the present suit, certain conferences and correspondences was carried on between petitioner and Mr. Carl Heck relative to the securing of the right of way. By letter of August 6, 1964 the petitioner offered the sum of $1,019.00 for the 10.19 acres to be taken by the right of way, which amounts to the sum of $100.00 per acre. These conferences and correspondences between the parties, in addition to the consideration to be paid for the right of way, concerned the request by the defendants that the location of the right of way strip, as it runs across defendants' property, be moved to the rear portion of said property. The petitioners refused to move the location of the right of way and subsequently offered the sum of $2,383.20 for the right of way strip, this sum being computed at the rate of $240.00 per acre for a 9.93 acre strip. During the course of the conferences and correspondences, the defendants made a counter offer of $75,000.00 for the taking and severance damages. No offer was made by the petitioner for consequential or severance damages.
Sections 12 and 13, which are owned by the defendants, front on Bayou Grosse Tete, which enters the Intracoastal Waterway in front of, or east of the defendants' property. Most of the frontage of defendants' property is on Bayou Grosse Tete, which according to the evidence, would have to be dredged to provide any large boat traffic. The right of way strip sought by the petitioners runs across the property approximately parallel to Bayou Grosse Tete, at a distance of about one-third of the depth of defendants' property from said bayou. The site of the right of way, as recommended and offered by the defendants, runs near the western edge of the property, however, it is not along the rear or western property line. In order to move the servitude as requested *764 by defendants, an angle or dog-leg would be required on the property of A. Wilbert Sons Lumber and Shingle Company situated south of defendants' property, however, the servitude, as it crosses defendants' property, would be along a straight line.
At the outset of the conferences and correspondences between the parties prior to the suit, Mr. Carl E. Heck, who represented the defendant family, advised the petitioner that the family had plans for a campsite subdivision on the property and asked various questions concerning the structures to be placed on the right of way by petitioner, whether any television or radio interference would be caused in the vicinity, as well as the request to remove the servitude to the rear of the property along an alley which they had set aside for utility lines. Although the question as to the radio and television interference was answered by petitioner, they failed to advise the defendants as to the type and size of the structures to be located thereon, and, of course, refused to move the location of the servitude.
By letter of November 6, 1964 the petitioner notified the defendants to the effect that due to the great difference between the valuation placed upon the right of way strip by the parties concerned, it was necessary that expropriation proceedings be commenced immediately in order to meet their construction schedule. In this letter, however, they did advise Mr. Heck that if he or any of the other owners of the property should ". . . find our offer acceptable, or wish to discuss the matter further, we shall be most happy to meet with you". By letter dated November 16, 1964 a reply by Clyde C. Caillouet, Attorney for the defendant family, advised the petitioner that his clients desired to discuss the matter further, and suggested a meeting at his office on November 25, 1964. Prior to the date of this meeting, on November 19, 1964, this suit was filed.
Certain exceptions were filed by the defendants, some of which were later dismissed upon motion by defendants, and others of which were referred to the merits. By way of interrogatories propounded upon petitioner, the answers to which were filed December 10, 1964, the defendants discovered that two electrical transmission lines, one 500KV and one 230KV, would cross their property. They were also advised as to the nature and size of the structures to be placed thereon. The 500KV line will be the largest electrical transmission line in the State of Louisiana, the evidence reflects that the only line in the United States of a similar size is located in the State of Virginia.
The Lower Court, which has not favored us with written reasons found that the highest and best use to which the property of defendants may reasonably be put was for industrial purposes, as logical expectation is that said property may be developed as industrial property in the near future. Based upon three comparable sales of other property in the area, the value of said servitude was fixed by the Lower Court at the sum of $680.00 per acre, or a total of $6,800.00 for the 10 acres comprising the servitude. As severance damages, the Lower Court allowed 10% of the 84.52 acres situated east of the servitude, comprising the front part of defendants' land lying between the servitude and Bayou Grosse Tete and the Intracoastal Waterway. Eliminated from the property upon which severance damages was given, was the 2.24 acres situated on the highway and Bayou Richard, both of which run across the front of the property.
The defendants filed a declinatory exception to the effect that petitioner failed to satisfy the legal conditions precedent to the filing of an expropriation suit, in that they did not attempt, prior to suit, to conduct bonafide negotiations as to the location of the proposed right of way, nor to the value of land within the limits of the *765 right of way sought, nor to the amount of severance damages to the adjoining property belonging to defendants and, furthermore, that petitioner has not made a tender of the true value of the land, or damages to defendants.
Article 1, Section 2 of the Constitution of the State of Louisiana provides that no person shall be deprived of life, liberty, or property except by due process of law, and that, except as otherwise provided in the constitution, private property shall not be taken or damaged except for public purposes and after just and adequate compensation is paid. The courts of this State have repeatedly held that expropriation laws, being special and exceptional in character and in derogation of common rights, must be strictly construed. Calcasieu & Southern Railway Company v. Witte, 224 La. 1091, 71 So.2d 854.
With regard to the expropriation of property, Article 2627 of the Louisiana Civil Code provides as follows:
"If the owner of a thing necessary for the general use, refuses to yield it, or demands an exorbitant price, he may be divested of the property by the authority of law."
Louisiana Revised Statutes, Title 19, Section 2, further provides, in part, as follows:
"Where a price cannot be agreed upon with the owner, any of the following may expropriate needed property:

* * * * * *
(9) Any domestic or foreign corporation created for the purpose of developing and transmitting electricity for power, lighting, heating, or other such uses. The buildings, transmission lines, stations, and substations expropriated or for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere with the use of the wires or other wire-using companies or, more than is necessary with the convenience of the land-owner." Emphasis added.
Thus we find that according to Article 2627 of the Civil Code and R.S. 9:2, as a condition precedent to the taking of property by condemnation proceedings, the condemnor must negotiate bona fide with the condemnee. Calcasieu & Southern Railway Company v. Witte, supra. The evidence present in the record of this proceeding discloses that the petitioner first saw a representative of the defendants relative to the securing of a servitude over the defendants' land on or about July 24, 1964. By letter dated August 6, 1964, from petitioner to Mr. Carl E. Heck, the defendants were offered the sum of $1,019.00 for the right of way across the 10.19 acres. The petitioner based this offer of $100.00 per acre upon what they claimed to be an appraisal by their real estate appraiser. Subsequently the offer was raised to the sum of $150.00, and then, at a conference held on October 30, 1964, Mr. Heck contends that an offer of $500.00 per acre was made. However, the final communication of petitioner prior to suit was by letter dated November 6, 1964, in which they offered the sum of $240.00 per acre, or the sum of $2,383.20 for 9.93 acres of land encompassed by the proposed right of way. In this said letter the petitioner offered to discuss the matter further in the event one or more of the defendants so desired. This offer of discussion was accepted by letter of defendants' attorney dated November 16, 1964, which was three days prior to the filing of the suit and prior to the time fixed for the conference. In none of these negotiations did the petitioners ever offer any consequential or severance damages, which is the damages to the remaining property of the condemnee caused by use for which the condemned property is taken.
During the course of the above negotiations between the parties, the defendants repeatedly *766 requested that the site of the right of way be relocated upon their property, and they repeatedly requested that discussions be had relative to the relocation. In the letter from petitioner to Mr. Heck dated August 6, 1964, the petitioner stated that "* * * this change is not impossible but would most certainly not be the best location considering costs and rights of way already secured. We can understand your request and might add, in laying out the locations of these rights of way we try, wherever possible, to follow property line but due to the irregular shapes of many properties it is just not possible to do so and exercise good engineering practice". Mr. Heck testified that at the conference held between petitioner and himself, the petitioner flatly refused to consider relocating the right of way. Furthermore, the testimony of the engineer of petitioner, who laid out the course of the right of way, testified that he did not attempt to locate the servitude along property lines.
As stated above, the first offer made by petitioner to defendants was upon the basis of $100.00 per acre which, according to the petitioner was the valuation fixed by their appraiser, Mr. John LeJeaunie, a real estate appraiser of Baton Rouge, Louisiana. Mr. LeJeaunie, upon taking the witness stand, testified that he appraised the property on September 18, 1964, at which time he set a value of $300.00 per acre, less 20% thereof, for the taking of the servitude. The 20% was deducted because this was a right of way, not a fee simple transaction. Thus, the figure for the right of way, according to Mr. LeJeaunie, was set at the sum of $240.00 per acre. Subsequent to this evaluation by Mr. LeJeaunie, the petitioner raised its offer to the sum of $150.00 per acre.
In our opinion, the petitioner failed to carry on bonafide negotiations with the defendants prior to the filing of this suit. Black's Law Dictionary describes "bonafide" as "in or with good faith; honestly, openly and sincerely". The law requires that such negotiations be above board.
The evidence discloses that petitioner raised its offer for the taking from $100.00 to $150.00 per acre after its own appraisers had fixed a valuation on the property at $240.00. No offer was ever made for severance damages, although defendant requested that such offer be made. We believe that there is no question that the construction of the powerful electrical transmission line across the property of defendants would cause severance damages to the remainder of its property both in the front and rear. The expert appraisers who testified on behalf of the defendants stated that severance damages to the remainder of defendants' property caused by the taking of the servitude would be from twenty to twenty-five per cent of the market value prior to the taking.
The nature of the structures, as well as the fact that there would be two high powered lines instead of one, were not disclosed to the defendants until after the filing of suit and in answer to interrogatories, although the defendants had requested this information. Certainly such information was necessary in considering severance damages. The Lower Court awarded severance damages to the front portion of defendants' property, although not for the rear.
In addition to the above, although defendants requested on many occasions that the line be moved to the rear of their property, and defendants offered a right of way across the rear portion at a nominal cost, the petitioner flatly refused to discuss such removal.
Without going into the merits of the question of the location or relocation of the proposed line, besides the Hecks who are named defendants herein and oppose the proposed location, we have been favored by the Iberville Parish Police Jury, City of Plaquemine, Plaquemine-Iberville Chamber of Commerce, Iberville Parish Economic Development Council, Town of Maringouin, Village of Rosedale, Village of Grosse Tete and Louisiana Farm Bureau Federation, *767 Inc., as Amicus Curiae, or friends of the Court, who are likewise opposing the said proposed location of said line. They allege that the route selected by plaintiff will damage some 1900 acres of valuable waterfront land and that the economic benefit that will be derived from the land will be forever lost to the community if this route is approved by the Court. We are therefore of the opinion that all of these facts warrant a true and honest good faith negotiation as to the location of the proposed line upon defendants' property.
In view of the failure on the part of petitioner to negotiate in good faith as to the price for the right of way, and its flat refusal to consider any severance damages or relocation of the line, we feel that the exception of prematurity is well taken. The exception is therefore maintained and the petitioner's suit is dismissed at petitioner's cost.
Judgment reversed.
REID, Judge (dissenting).
The majority of this Court in their opinion herein has found that the plaintiff failed to negotiate in good faith as to the price for the right of way and refused to consider any severance damages or relocation of the line and sustained an exception of prematurity, dismissing plaintiff's suit at plaintiff's costs.
I cannot agree with this ruling by the majority herein. The record discloses that there were several conferences and some correspondence concerning the price and that the plaintiff raised its original offer. The plaintiff did not offer to negotiate on the proposed location of the line. On November 2, 1964 Mr. Heck, one of the defendants wrote to plaintiff complaining about the offers made to him by Gulf States, reiterated his objections to the route selected and asked that the line be rerouted or alternatively that they be paid severance damages. He stated in his letter that he felt that his family would grant the requested right of way at the requested location for the sum of $75,000.00.
Gulf States wrote to Mr. Heck on November 6, 1964 stating that Gulf States regretted that an agreement had not been reached concerning the right of way and attached a map showing the location of the proposed servitude and enclosed a servitude agreement form outlining the rights sought by Gulf States. The letter further advised defendants that the plaintiff could not agree to the request for the payment of $75,000.00 and that the only alternative left to them would be filing of the expropriation proceedings and let the Courts decide the matter. The letter further stated "If you * * * wish to discuss the matter further we shall be most happy to meet you. However, due to the very large difference between our appraised value and the amount you are requesting it appears that expropriation proceedings is the only method left for deciding the matter and we must proceed along these lines immediately in order to meet our construction schedule." (Emphasis supplied.) This letter was not answered by defendants until November 16, 1964 when this attorney wrote and suggested a meeting on November 25, 1964. I believe this delay led the plaintiff into believing that there was no hope for an amicable settlement and suit was filed on November 19, 1964, at least one day after the earliest time plaintiff could have received this letter.
It seems to me that the ruling of the majority borders on compulsory arbitration. Bona fide negotiation does not mean that the parties have to negotiate until they arrive at a mutual settlement. I feel that when parties have negotiated in good faith, as I think they have done in this case, and they see that they cannot arrive at an amicable settlement because of the wide difference in their ideas of value, severance damages, and of the location of the right of way, then it is left up to the Court to decide.
*768 The majority opinion does not set any guides lines or define what bona fide negotiation is, or when it was stopped or concluded. I feel that this ruling of the majority will lay the foundation in the future for similar pleas of prematurity to be filed in every expropriation suit that is filed in Louisiana.
The record had been made up, all the evidence was before the Court and nothing could be gained by remanding the matter to the Lower Court. There is an old maxim of the law that "Justice long delayed is justice denied."
For these reasons I respectfully dissent.
ELLIS, J., concurs.

On Rehearing
Before LOTTINGER, LANDRY, REID, BAILES, and LEAR, JJ.
REID, Judge.
Both plaintiff and defendants applied for a rehearing in this case. The plaintiff applied for a rehearing on the grounds that the decision of the majority of this Court was incorrect in sustaining defendants' plea of prematurity, which plea was based on defendants' contention that plaintiff failed to negotiate in good faith as to the price for the right-of-way and refused to consider severance damages and the relocation of the line. The defendants, although asking that the judgment of the majority on the original hearing be affirmed, asked for a rehearing on their contention that the opinion should not have been based on the dilatory exception of prematurity but on defendants' exception of no right of action based on plaintiff's failure to negotiate in good faith as to location of the transmission line, and asked that the Court grant the rehearing limited to said inadvertent reference to the exception. This action by the defendants was based on a stipulation of counsel agreeing to dismiss the dilatory and declinatory exceptions filed by the defendants, including the exception of prematurity, and agreeing to let the peremptory exception of no right or cause of action go to the merits and be heard at the time of the trial. This stipulation was not brought to the attention of the Court during the original argument of the case. In fact both parties argued the question of prematurity at length before this Court at said hearing. The rehearing requested by the parties was therefore granted.
The facts and issues involved in this case are well set forth in the original opinion of the majority, as well as in the dissent, and will not be discussed again at this time.
It should be pointed out, however, that the majority opinion upheld the exception of prematurity not only because of its finding that the plaintiff had failed to negotiate in good faith as to the location or relocation of the proposed line, but also on the failure of the plaintiff to negotiate in good faith as to the price to be paid for the right-of-way and to consider severance damages. It is our opinion that the latter two points are not at issue herein as neither in plaintiff's original brief nor in its brief on rehearing were these issues raised, and the question of severance damages is raised by the defendants in their brief alternatively on the merits rather than under the exception of no right of action.
Defendants' exception of no right of action is based on their interpretation of LSA-R.S. 19:2(9) which reads as follows:
"(9) Any domestic or foreign corporation created for the purpose of developing and transmitting electricity for power, lighting, heating, or other such uses. The buildings, transmission lines, stations, and sub-stations expropriated or for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous *769 to persons or property nor interfere with the use of the wires of other wire-using companies or, more than is necessary, with the convenience of the land-owner."
Defendants' exception reads in pertinent part as follows:
"(b) In fixing the location of the proposed electrical transmission line across the front portion of exceptors' tract of land plaintiff has refused to comply with the mandatory provisions of La.R.S. 19:2(9) requiring that `* * transmission lines * * * for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere * * * with the convenience of the land-owner,' and the proposed location of the electrical transmission line across the property of exceptors is unduly burdensome in that it crosses the front portion of exceptors' property in such a manner as to substantially destroy 330 acres of exceptors' property which fronts on the Intracoastal Waterway, Bayou Grosse Tete, and Louisiana Highway No. 77 and the placing of this line will constitute an ultra-hazardous instrumentality upon exceptors' property which will be dangerous to persons and property all of which will result in excessive inconvenience to exceptors and cause substantial and irreparable damage and injury to all of exceptors' 330 acres of land, and plaintiff has not conducted bona fide negotiations with exceptors in an attempt to comply with said statute."
In their brief on rehearing the defendants further illustrate their position by stating:
"Defendants' Exception of No Right of Action in part is stated as follows:
`In fixing the location of the proposed electrical transmission line across the front portion of exceptor's tract of land plaintiff has refused to comply with the mandatory provisions of La.R.S. 19:2(9) * * * and plaintiff has not conducted bona fide negotiations with exceptors in an attempt to comply with said statute.' (R. pp. 20-21)
"This court, in its original opinion, held that as a `condition precedent' to expropriation the expropriator must enter into bona fide negotiations with the landowner, both as to price and location, and found that `the petitioner failed to carry on bona fide negotiations with the defendants prior to the filing of this suit.' (Op. p. 7) This court further held:
`We are therefore of the opinion that all of these facts warrant a true and honest good faith negotiation as to the location of the proposed line upon defendants' property.' (Op. pp. 8-9)
"As defendants have repeatedly urged, the refusal of plaintiff to negotiate as to location is, not in itself the basis for their Exception of No Right of Action. In the exception defendants point to plaintiff's refusal to negotiate as to location as proof that plaintiff did not even attempt to comply with the provisions of R.S. 19:2(9)." (Emphasis added by counsel for defendants.)
An examination of the statute and of the exception leads this Court to believe that the defendants' position is not properly raised under an exception of no right of action but would have been properly raised by exception of prematurity or no cause of action.
LSA-C.C.P. Article 927 defines "No right of action" as "no interest in the plaintiff to institute the suit." There is no question but that under the plain meaning of LSA-R.S. 19:2(1) the Gulf States Utilities Company had a right to bring an expropriation suit where a price could not be agreed upon, and it is clear from the record that the price could not *770 be agreed upon. As the question of price was not raised by the defendant under its exception of no right of action, the Gulf States would have a right of action upon its complying with the requirements of R.S. 19:2(9), but its failure to do so would permit the defendants to bring an exception of prematurity or of no cause of action. It is our opinion that the defendants' exception of no right of action is not valid, is improperly brought and should be dismissed.
The question of whether or not plaintiff had met the requirements of LSA-R.S. 19:2(9) regarding the location of the line is raised by the defendants in their answer, and in their brief on appeal under Specification of Errors stated:
"3. The court below erred in granting plaintiff a servitude for the construction of the transmission line across the front portion of defendants' land, without proof of the necessity thereof, rather than requiring plaintiff to locate the line across the rear of the tract so as not to be, more than is necessary, dangerous to persons and property and interfere with the convenience of the landowners."
and they reurge in their brief on rehearing that Gulf States has not offered any evidence to prove the most material allegation of its petition wherein it alleged "The * * * said transmission line * * * will not be dangerous to persons or property, nor inconvenience the owner of the said property * * *," quoting from paragraph 11 of plaintiff's petition.
It is important at this point to show that at the time of the filing of the suit the plaintiff had completed its negotiations with the adjoining landowners and therefore the only matter at issue was the location of the line across the defendants' property. Therefore, the defendants' contention that the adjoining landowners would be willing to grant a right-of-way across different parts of their property provided Gulf States would relocate its line, is not an issue before this Court. This alleged willingness of adjoining landowners to acquiesce in a change of line was a matter that arose after the filing of the suit and after the question of expropriation was put at issue.
As stated by both plaintiff and defendants in their briefs, the question of route selection is controlled by that part of LSA-R.S. 19:2(9) which reads thus:
"* * * The buildings, transmission lines, stations, and substations expropriated or for which property was expropriated shall be so located, constructed, operated, and maintained as not to be dangerous to persons or property nor interfere with the use of the wires of other wire-using companies or, more than is necessary, with the convenience of the land-owner."
It is clear from defendants' brief that they primarily rely on that portion of the above quoted statute which requires the expropriating authority "not to * * * interfere * * * more than is necessary, with the convenience of the land-owner."
The defendants would have this Court believe that at no time did the plaintiff conduct negotiations or discussions with the defendants on the question of relocation of the proposed line and contend that the plaintiff did not properly inform defendants as to the nature and type of the structure to be placed on the defendants' property. An examination of the record discloses, however, that from the outset one of the defendants, Mr. Carl E. Heck, represented all of the defendants in the negotiations, he was aware of the proposed location of the line and was substantially informed as to the type of line to be built, and the record further shows that Mr. Heck was willing to accept the location proposed by Gulf States if the price was right.
*771 The testimony and the documents filed in evidence show there were extended discussions concerning the location of the line. By letter dated July 24, 1964, marked Defendants' Exhibit D-2, addressed to Gulf States Utilities Company, attention Mr. James R. Cornelius, Mr. Heck stated that he had examined a map showing a line marked in crayon on a Tobin map which depicted a proposed power line and that the placing of the power line in that location would drastically affect the value of the property. He stated further that he would be agreeable to granting the company a right-of-way across the back part of the property. On August 6, 1964, Exhibit "D-3", Mr. J. Ben Fanette, Supervisor of Right-of-Way for Gulf States Utilities Company, wrote Mr. Heck that they were unable to comply with his request to relocate the proposed right-of-way across the rear portion of the property, and although he admitted that the change would not be impossible, it would most certainly not be the best location considering cost and rights of way already secured. By letter dated September 16, 1964, Exhibit "D-5", Mr. Ben Fanette advised Mr. Heck that the proposed electric line would be constructed in accordance with the National Electric Safety Code and stated that in locating the transmission line they had taken into consideration all properties involved along the entire route and had taken the least objectionable location to everyone concerned. On September 28, 1964, Mr. Heck advised Gulf States that members of his family were particularly concerned with interference to radio and television reception in the lots which would be adjacent to the proposed right-of-way on each side. He also requested a map showing the general pipeline route from the vicinity of Grosse Tete to a few miles to the east of defendants' property, which he felt would be helpful in presenting the entire picture at a family meeting to be held in the very near future. On October 2, 1964 Mr. Fanette advised Mr. Heck that he could answer with confidence that the facilities would not generate any more interference than many lines already in operation, and would generate less radio and television interference than many lines that have been in commercial operation for many years throughout the United States. He also forwarded the area map requested by Mr. Heck. On October 10, 1964, Mr. Heck wrote plaintiff and objected to the appraisal made by the company and requested reconsideration. He again offered to grant a right of way across the rear portion of the property and agreed to enter into a rental agreement for as long as the company wished. On October 26, 1964 Mr. Heck again wrote plaintiff and referred to the contents of his letter of October 10 asking reconsideration of the company's proposition and stated that he felt he may be able to work out an arrangement with the company if he had a reasonable proposition to submit to the members of his family but that he had not heard further from the company. He pointed out that he felt an appraiser should consider the effect of severance to the entire tract and said:
"The members of my family with whom I spoke are entirely agreeable to the granting of a Right of Way to your company, across the rear portion of our property. We are willing to go along with your planned location, if you feel that a great savings would accrue to your benefit. At the same time, we feel that you should also be fair to the extent that we should receive an equitable remuneration for the value of the depreciation of value to our property, as a result of your proposed Right of Way across our property which would be placed at a location to suit your convenience and at a savings to your company."
And again on November 2, 1964, Mr. Heck wrote plaintiff confirming a conference held with plaintiff's representatives on October 30. He stated that they had considered *772 the property's potential from a standpoint of industrial development and camp sites, and he discussed in detail the amount of money offered which he felt was not sufficient. He asked that the company reconsider the rerouting of the line along the back line of the property, in which case they would prefer to grant a right of way for $150 per acre in lieu of receiving $75,000 from the company for granting of the proposed right of way. On November 6, 1964, Mr. N. C. Spencer, Superintendent of Electrical and Civil Engineering for the Gulf States Utilities Company, wrote Mr. Heck that the company regretted they were unable to reach an agreement and that the only alternative left to the company was the filing of expropriation proceedings.
It is therefore clear to this Court that there was ample discussion between plaintiff and defendants concerning the location of the proposed line.
It is also clear from the correspondence filed in evidence that the defendants were substantially informed of the type of line.
Determinative of the question of whether or not the plaintiff, in locating its line as it did, met the test of not interfering more than is necessary with the convenience of the landowner, is the test set forth by this Court in the case of Central Louisiana Electric Co., Inc. v. Covington & St. Tammany Land & Improvement Co., Fla.App., 131 So.2d 369, wherein this Court held:
"The question presented for determination, namely, the extent of the obligation incumbent upon plaintiff by the limitations and restrictions respecting safety to persons and property and minimization of inconvenience to landowners, is apparently presented to this court as a matter of first impression insofar as the jurisprudence of our own state is concerned.
"Regarding the general subject matter of expropriation the jurisprudence of this state has evolved certain fundamental concepts and rules which have been repeated on innumerable occasions. One such cardinal principle is that in the location of rights-of-way considerable discretion is vested in the expropriating authority and the courts will not disturb or interfere with the exercise thereof in the absence of fraud, bad faith or conduct or practices amounting to an abuse of the privilege. [Citations]
"It is also well settled that availability of other and alternate routes is of no concern to the property owner whose land is sought to be expropriated provided the location selected fulfills the needs and requirements of the expropriator, meets the standards prescribed by sound engineering and economic practices, is neither arbitrarily nor capriciously chosen, and does not constitute an abuse of the discretionary right of selection. In Kansas City, S. & G. Ry. Co. v. Vicksburg, S. & P. Ry. Co., 49 La.Ann. 29, 21 So. 144, 145, we find:
"`The defendant's appreciation of that necessity seems to make the test whether or not the land of others, equally adapted, as it contends, for plaintiff's uses, cannot be obtained. * * * "While we have examined this phase of the controversy, it must seem difficult to maintain, as the test of expropriation, that lands of others than the proprietor should be taken. Expropriation, in most instances, is deemed as sacrifice by the proprietor called on to make the surrender. If one proprietor could defeat the expropriation on the ground that the call should be made on another, the supposed compulsion of the law requiring private property for the public good would be of no efficacy. The necessity, in legal contemplation, that is to be the guide in selecting land for an unquestioned public purpose, is to be understood in a reasonable sense. * * *""
*773 In Louisiana & A. Ry. Co. v. Louisiana Ry. & Nav. Co., 125 La. 756, 51 So. 712, we note:
"`The necessity for the exercise for of the right of eminent domain must be understood in a reasonable sense, with due regard to the needs of the plaintiff corporation and all the elements of judicious selection. The objection that other property should be taken furnishes no test for the necessity for expropriation in ordinary cases.'

* * * * * *
It is elementary that in all expropriation cases the prohibition against arbitrary, unreasonable, capricious and unnecessary taking is ever present. We conclude the provisions of the statute involved herein address themselves primarily to the question of necessity of taking and reasonableness of the exercise of the discretion vested in the expropriating body. We believe the provision places a somewhat more onerous duty on the present plaintiff but that nevertheless it must be construed with reason. The interpretation urged by defendants, namely, that landowners must be protected against any danger or inconvenience at all costs and in any event, is, in our judgment, unreasonable and would lead but to absurd and illogical conclusions. * * *"
An examination of the facts in this case clearly shows that Gulf States met the test set forth in that case. We find nothing in the record or in the briefs which would lead this Court to feel that the facts in this case are such that the rule of the Central Louisiana Electric case would not apply. We make this statement being fully aware that in the Central Louisiana Electric case the landowner was attempting to have the right of way moved off his own property and placed on the property of someone else. We cannot agree with defendants' contention that the Central Louisiana Electric case merely stands for the proposition that a landowner can raise as a defense a contention that he must be protected against any danger or inconvenience.
During the proceedings herein various briefs amicus curiae were filed by interested parties but an examination of these briefs discloses that the interest of these parties is not so much directed at the question at issue, that is, the expropriation by the plaintiff of defendants' property, but deal mostly with the question of relocation of the line over a large area, and while the Court is sympathetic with the concern felt by these people, it is felt by this Court that the issues raised in their briefs are outside of the issues in this case. This is especially true in view of the fact that rights of way for practically the entire line in question were obtained prior to the filing of this suit and all of the interests shown by the authors of the amicus curiae briefs arose after the filing of this suit and after the location of the line had been almost entirely completed.
It is also clear that the various public bodies in the area in question knew of the location of this line. Its location had wide publicity and the plaintiff itself had informed the governing body of the Parish of its intention.
Regarding the question of damages, the District Court awarded the defendants the sum of $6,800.00 in full payment for the 10 acres contained in the servitude and granted an additional sum of $5,747.36 as severance damages, said award being based on $680.00 value on the property in question per acre, and found that the front portion of the tract, lying between the servitude and Bayou Grosse Tete and the Intracoastal Waterway would be damaged in the amount of 10%, or to the extent of $68.00 per acre for 84.52 acres net or $5,747.36 severance damages.
Plaintiff filed an answer to the appeal and contended that the award was excessive and should be reduced to an amount *774 not in excess of $3,000.00, including the taking and any possible severance damages. Defendants on the other hand contend that the award should be increased by awarding defendants severance damages on the rear 226.70 acres in an amount of $38,539.00, and that if the Court sustained the expropriation the award should be increased by that amount.
This Court does not feel that the award by the District Court was manifestly erroneous or excessive insofar as it goes. As the Trial Judge did not render written reasons in this matter we have no way of knowing his reasons for refusing to grant defendants severance damages on the rear 226.70 acres. In its original opinion this Court held:
"* * * We believe that there is no question that the construction of the powerful electrical transmission line across the property of defendants would cause severance damages to the remainder of its property both in the front and rear. The expert appraisers who testified on behalf of the defendants stated that severance damages to the remainder of defendants' property caused by the taking of the servitude would be from twenty to twenty-five per cent of the market value prior to the taking."
While we do not feel that an award of 20-25% of the market value should be allowed in this case, we see nothing in the record which would indicate that the rear portion of the defendants' property was not damaged to the same extent as the front portion.
Without going into the matter in detail, this Court believes there is no question but what the size of the right of way, the nature of the transmission line and its location on the property, have definitely damaged the remainder of defendants' property, and therefore, this Court will award severance damages to the defendants in an amount of 10% or to the extent of $68.00 per acre for the 226.70 acres or a total amount of $15,415.60, thus raising the total award in this case to $27,962.96.
The value of $680.00 per acre is certainly not out of line when compared with other prices paid by plaintiff to other landowners in the same area whose rights of way were obtained by negotiations, and while such other prices paid by plaintiff to other landowners with whom it negotiated would not be binding upon this Court in fixing a value, they certainly lend great weight to the correctness of the trial Judge's award.
For the above and foregoing reasons the judgment of the District Court is amended in accordance herewith by increasing the total award to $27,962.96, and, as amended, the judgment of the lower Court is affirmed.
Amended and affirmed.