HEARD, Judge.
This is an expropriation proceeding whereby Southwestern Electric Power Company (SWEPCO) seeks to expropriate a right of way across property owned by Jesse E. Jones, John Paul Jones, Marjorie Jones Keeth, Martha Ree Jones, Louise Jones Grisham, Betty Jane Jones Lee and Alice Jones Fawcett. This rigid of way is part of a project to construct a 69/138 KV electric transmission line from SWEPCO’s primary supply point at Dixie, Caddo Parrish, Louisiana to its Red Point Substation near Haughton in Bossier Parish, Louisiana. The new line will provide a grid loop system in place of the present radial system serving the area. The proposed right of way on the Jones property would cross the property for a distance of approximately 7,015 feet and would be 100 feet in width, thus encompassing 16.10 acres. Defendants assert that there is no need for the new line. In the alternative, they as *678 sert that there is no need for the line to cross their property, and in the further alternative, assert that there are less damaging routes for the line on their property.
The trial court found that the new line was necessary, that SWEPCO had not abused their discretion in the location of the line, and that a value of $250 per acre was a fair value for the 16.10 acres in full ownership. The trial judge held that the servitude expropriated would be less valuable than a taking in full ownership, and consequently awarded defendants 75% of the fair value or $3,018.75. Defendants appealed devolutively from this judgment.
We have previously considered the issue of the necessity of this new transmission line in Southwestern Electric Power Company v. Conger, 254 So.2d 98, La.App., (2d Cir. 1971). We upheld the trial judge’s finding of the necessity in that case, and see no reason to reverse that holding.
Defendants assert that SWEPCO abused its discretion in the location of this new line.
“In the location of a right of way or other improvement, the taker is vested with considerable discretion and its selection of location will not be disturbed unless made arbitrarily or in bad faith. The selection of the location is within the sound discretion of all takers, whether public or private. Thus the defendant must show that the taker has abused his discretion in placing the improvement on the site chosen. The existence of other alternate routes will not alone be a defense to the taking. The elements to be considered in determining the question of abuse of discretion are said to be (1) whether the location fulfills the needs of the expropriator, (2) whether the location meets the standards imposed by sound engineering and economic practices, and (3) whether the site is not chosen arbitrarily so as to constitute an abuse of discretion. If the defendant can show that one of these criteria has not been met, he will have carried his burden and the taking will be set aside as arbitrary.” [Dakin and Klein, Eminent Domain in Louisiana, (1970), Chapter VI, § 2, pgs. 367-368].
See also Louisiana Power & Light Company v. Anderson, La.App., 188 So.2d 733 (2d Cir. 1966); Central Louisiana Electric Company v. Covington & St. Tammany Land & Improvement Company, La.App., 131 So.2d 369, (1st Cir. 1961).
Defendants have not carried their burden of proving an abuse of discretion in the location of the new line. In fact, SWEPCO proved that the location would fulfill their needs, that it met the standards imposed by sound engineering and economic practices, and that it was not arbitrarily located.
Robert F. Scott, Vice President of SWEPCO and manager of the Louisiana division, testified that the new line was needed. Further, he explained why the line turned in certain places. He testified that after determining the general route for a new line SWEPCO flies over the general area and takes aerial photographs. After this, a ground survey narrows down the route further. Finally, ownership of the land is determined and the property owners are approached concerning acquisition of the servitude.
Robert Watt, assistant planning engineer for SWEPCO, also testified that the new line was needed. He stated that the “. . . line is the most feasible and practical line to serve the needs.”
C. H. McDonald, head of transmission line design and construction for SWEPCO, inspected the ground area where the line would run. He stated that the proposed route “. . . is the best location we could come up with.”
The uncontradicted testimony of these three witnesses shows that the new line fulfills SWEPCO’s needs, that it is located in accordance with sound engineering and economic practices, and that the decision *679 of where to locate the new line was not arbitrarily made.
The compensation due defendants is determined by ascertaining the market value of the land taken. Louisiana Power & Light Company v. Dixon, La.App., 201 So.2d 346 (2d Cir. 1967). Market value for expropriation purposes is the price which would be agreed upon between a willing and informed buyer and seller under usual and ordinary circumstances. State Through Department of Highways v. Mouledous, La.App., 200 So.2d 384 (3d Cir. 1967); Louisiana Power & Light Company v. Roy, La.App., 198 So.2d 484 (2d Cir. 1966). What a willing buyer would pay a willing seller under usual circumstances must include a consideration of the highest and best use to which the property may reasonably be put in the not too distant future. Texas Gas Transmission Corporation v. Broussard, La.App., 196 So.2d 620 (3d Cir. 1967). Comparable sales, i. e., recent sales of similar property, are good indicators of what a willing buyer would pay a willing seller under usual circumstances. State Through Department of Highways v. Fontenot, La.App., 194 So.2d 404 (3d Cir. 1967); State Through Department of Highways v. Babineaux, La.App., 189 So. 2d 450 (3d Cir. 1966); State Through Department of Highways v. DeLoach, La. App., 188 So.2d 614 (3d Cir. 1966).
Walter L. Hunter, realtor and appraiser, testified that the highest and best use of defendants’ property is for growing timber. Of the 16.10 acres sought to be taken, Hunter appraised 4.59 acres at $75 per acre and 11.51 acres at $250 per acre. This amounts to a total market value of $3,221.75. Hunter felt that the servitude did not amount to a full taking and consequently allowed defendants 75% of the market value or $2,416.31. Hunter used six comparable sales in ascertaining the market value of defendants’ property. His first comparable sale was from Joe Parks to John D. Bundy. The price was $304 per acre for land with a small amount of road frontage, level, and about four-fifths cleared. Hunter’s second comparable sale was from Charles P. Brigham to R. L. Wyche, Jr. The price was $300 per acre for improved pasture land which was well drained and accessible. Hunter’s third comparable sale is from Paul Tucker to J. S. Turner and J. E. Fowler, Jr. at $190 per acre. Later, Turner sold to Fowler at the price of $236 per acre for land accessible by a good gravel road which was level, well drained, mostly open pasture. Hunter’s fourth comparable sale was from Susan Buzick to J. E. Fowler, Jr. at $125 per acre. The land lies within site of the proposed Black Bayou dam and the area adjacent to the easterly end of the dam is high ground, affording a good view of the lake to the north. Hunter’s fifth comparable sale was from John O. Gotcher to J. E. Burt, Jr. and D. C. Davis at $100 per acre for land which was unusually level and completely cleared for pasture use. Hunter’s sixth comparable sale was from N. B. Stoer to J. E. Fowler, Jr. for $150 per acre for land adjoining the tract purchased by Fowler in the fourth comparable sale.
Frank Grigsby, realtor and appraiser, testified that the highest and best use for the property was agricultural to the extent of timber growing. Grigsby appraised the 16.10 acres at $200 per acre, or a total market value of $3,220. Like Hunter, Grigsby allowed defendants 75% of the market value for the servitude, or $2,415. Grigsby used eight comparable sales in arriving at the market value. The first comparable was from Susan Buzick to J. E. Fowler, Jr. and is the same as Hunter’s fourth comparable. The second comparable was from N. B. Stoer to J. E. Fowler, Jr. and is the same as Hunter’s sixth comparable sale. The third comparable sale was from R. E. Wallace to Laurie G. Campbell at a price of $200 per acre for land located next to defendants’ property. The fourth comparable sale was from J. E. Jones, et al. to Cypress-Black Bayou Recreation and Water Conservation District at a price of $80 per acre for land which is a portion of the same property SWEPCO seeks to expropriate. The fifth compara *680 ble sale was from Jessie W. Hooper to E. G. Wyche. The price was $75 per acre for land located one-half mile west of defendants’ property. The sixth comparable sale was from John O. Gotcher to J. E. Burt, Jr. and D. C. Davis. This is the same as Hunter’s fifth comparable sale. The seventh comparable sale was from T. W. Keith and T. B. Montgomery to J. E. Fowler, Jr. for $245 per acre for land located one and one-half miles southeast of defendants’ property. The eighth comparable sale was from Stoddart Smith to E. G. Wyche at a price of $75 per acre for land located one-half mile west of defendants’ property.
A. C. Montgomery, realtor and appraiser, testified that the highest and best use for defendants’ property is residential. He appraised the 16.10 acres at $500 per acre or $8,050. Montgomery used twelve comparable sales in arriving at the market value, the first from T. L. Jones to Mrs. E. B. Whittington. The price was $780 per acre for land quite far from defendants’ property very near downtown Benton. The second comparable sale was from Jesse E. Jones, et al. to Mrs. E. T. Boyd for a price of $2,500 per acre. The third comparable sale was from the estate of W. B. Jacobs to Cypress-Black Bayou Recreation and Water Conservation District for $300.61 per acre for land very close to defendants’ property and fronting in part on the Cypress-Bayou Reservoir. Comparable four is a sale from G. S. Wyche, Jr. to Johnnie Jackson, et al. for $1,000 per acre for land quite far from defendants’ property fronting in part on State Highway 162. The fifth comparable sale was from G. S. Wyche, Jr. to C. A. Lewis, et al. at a price of $557.38 per acre for land in the same area as comparable four. The sixth comparable sale was from G. S. Wyche, Jr. to Aurelio Prado, et al. for $600 per acre for land in the same area as comparables four and five. The seventh comparable sale was from H. L. Carey to J. M. Durham and A. J. Dupuy, Sr. at $456 per acre for land quite far from defendants’ property. The eighth comparable sale was from Barney Burks to J. M. Durham and A. J. Du-puy, Sr. for $395 per acre for land in the area of comparable seven and fronting in part on the Dixie-Overland Highway. The ninth comparable sale was from B. B. Daniel to T. W. Alley for a price of $1,100 per acre for land located quite a distance from defendants’ property. The tenth comparable sale was from Jesse E. Jones, et al. to A. J. Kelly at a price of $2,500 per acre for land reasonably close to defendants’ and fronting on Swan Lake Road. The eleventh comparable sale was from Jesse E. Jones, et al. to Charles E. Keene at a price of $2,500 per acre for land in the same area as comparable ten. The twelfth comparable sale was from Jesse E. Jones, et al. to B. T. Kelly for $2,500 per acre for land in the same area as com-parables ten and eleven.
The discrepancy between the market value as appraised by the three experts is due to the comparables used. Most of A. C. Montgomery’s comparables are sales of small tracts of land which front on hard surfaced roads. Further, most of Montgomery’s comparable sales are quite far removed from defendants’ property. Montgomery’s third comparable sale, unlike his others, is quite close to defendants’ property. The price of this sale was $300.61 per acre.
The evidence in this case supports the conclusion that the Jones’ property will, in the future, front on a lake used for drinking water and recreational purposes. Walter L. Hunter considered the future lake frontage in making his appraisal, although he did not feel that the value of the Jones’ property should be increased by this fact since there is no road access to the property. Frank Grigsby and A. C. Montgomery did not consider the future lake frontage in making their respective appraisals. As none of the experts felt that the lake frontage should be considered as affecting the market value, we do not consider it as affecting it either. The lake project itself is relatively certain, but the effect of the lake on the market value of the subject property seems to be a matter for speculation.
*681 Appropriate in this case is the rule that “ . . . opinion evidence of expert witnesses regarding the value of the land involved should be given effect when it appears to be well grounded from the standpoints of sincerity and good reasoning.” State Through Department of Highways v. Rapier, La.App., 152 So.2d 272, 279 (1st Cir. 1963). Good reasoning requires meaningful comparables. Montgomery’s compa-rables, with the exception of his third one, are simply too far removed from the subject property to be accepted as meaningful.
The truly comparable sales in this case indicate that $250 per acre is a fair market value for the Jones’ property.
The trial judge allowed defendants 75% of the market value because the servitude did not amount to a full taking. This is in line with the jurisprudence. Louisiana Power and Light Co. v. Greenwald, La. App., 188 So.2d 618 (2d Cir. 1966) writ refused, 249 La. 740, 190 So.2d 243 (1966); Texas Gas Transmission Corporation v. Pierce, La.App., 192 So.2d 561 (3d Cir. 1966).
For the above stated reasons, the judgment appealed from is affirmed with costs to be borne by appellants.
BOLIN, J., dissents with written reasons.